Emma L. Mediak, Esquire
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, Montana  59807-7909
Tel:  (406) 523-2500
Fax:  (406) 523-2595
E-mail:  elmediak@garlington.com

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

|  |  |
|---|---|
| The Kroger Co., Hy-Vee, Inc., Save Mart Supermarkets LLC, US Foods, Inc. and Albertsons Companies, Inc., | Case No. CV-22-89-GF-BMM |
| Plaintiffs, |  |
| vs. | **Complaint and Demand for Jury Trial** |
| Cargill, Inc., Cargill Meat Solution (a/k/a Cargill Protein a/k/a Cargill Protein – North America), JBS S.A., JBS USA Food Company, Swift Beef Company, JBS Packerland, Inc., National Beef Packing Company LLC, Tyson Foods, Inc., and Tyson Fresh Meats, Inc., |  |
| Defendants. |  |

Plaintiffs The Kroger Co., Hy-Vee, Inc., Save Mart Supermarkets LLC, US

Foods, Inc. and Albertsons Companies, Inc. (collectively, "Plaintiffs") sue

Defendants Tyson Foods, Inc. ("Tyson Foods"), Tyson Fresh Meats, Inc. ("Tyson Fresh"), Cargill, Inc. ("Cargill"), Cargill Meat Solutions Corporation (a/k/a Cargill Protein) (a/k/a Cargill Protein – North America) ("CMS"), JBS S.A., JBS USA Food Company ("JBS USA"), Swift Beef Company ("Swift"), JBS Packerland, Inc. ("Packerland"), and National Beef Packing Company LLC ("National Beef") (collectively, "Defendants"), and allege as follows:

## I.   **NATURE OF THIS ACTION**

1.     As alleged more fully below, beginning at a time uncertain, but at least as early as approximately January 1, 2015, and continuing and with an effect thereafter, Defendants and co-conspirators engaged in a contract, combination or conspiracy in restraint of trade or commerce in violation of Section One of the Sherman Act.  The goal of their conspiracy included fixing, raising, stabilizing or maintaining the price of beef[1] sold to Plaintiffs and others at supracompetitive levels – that is, prices artificially higher than beef prices would have been in the absence of their conspiracy.  Defendants' conspiracy was effective and achieved that goal. The full scope and measure of the conspiracy will require discovery.  However, as

---

[1]     In this Complaint, "beef" includes boxed and case-ready meat processed by Defendants and other smaller, non-Defendant producers from cattle, including primal cuts, trim or sub-primal products, further-processed and value added products, offal or variety products, and rendered products and by products. "Fed cattle" means steers and heifers raised in feedlots on concentrated diets to be produced and sold as beef.

alleged in this Complaint, Defendants and their co-conspirators implemented their conspiracy through one or more anticompetitive means.  For example, and without limitation, they implemented their conspiracy by coordinating, manipulating or agreeing to pay less than competitive prices for the main or primary input in producing beef, namely, slaughter-ready cattle (*i.e.*, fed cattle), for the purpose and with the effect of fixing, increasing, stabilizing or maintaining above competitive levels their margins on and the price of beef sold to Plaintiffs and others. Additionally, or in the alternative, as a further example, Defendants and their co-conspirators implemented their conspiracy by collusively reducing the slaughter-ready cattle and beef supply, which over time artificially elevated the price of beef that they sold to Plaintiffs and others.  Also, as more fully described below, Plaintiffs allege that Defendants and their co-conspirators' conduct alleged in this Complaint violates the Packers and Stockyards Act.

2.     Each Plaintiff purchased beef in the United States directly from one or more of the Defendants and co-conspirators from at least January 1, 2015, until the present (the "Relevant Period").

3.     Defendants are the world's largest meat processing and packing companies, known in the industry as meatpackers or packers.  In 2018, Defendants sold approximately 80 percent of the more than 25 million pounds of beef supplied to the U.S. market.  Collectively, they controlled approximately 81-85 percent of the

domestic market-ready fed cattle processed (or slaughtered) during the time relevant to Plaintiffs' claims.[2]  The next largest, non-Defendant meatpacker had only a 2-3 percent market share.

4.      The U.S. Department of Justice ("DOJ") and U.S. Department of Agriculture ("USDA") have launched investigations into whether Defendants fixed beef prices in the United States.  In June, 2020, news sources reported that the DOJ's Antitrust Division sent civil subpoenas to Defendants JBS S.A., Tyson Foods, Cargill, and National Beef Inc. (a company related to Defendant National Beef) seeking information relating to their pricing practices dating back to January 2015.

5.      The DOJ's investigation followed a March 12, 2020, Senate Subcommittee hearing,[3] during which Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices.  Secretary Perdue expressed concern that meatpackers, such as Defendants, were paying lower prices for cattle without passing the cost savings on to beef purchasers such as Plaintiffs.  As he explained, the difference between prices for cattle and prices for wholesale beef was "historically high."

---

[2]      In 1977, the largest four beef-packing firms controlled just 25% of the market, compared to 85% of the market by 2018.

[3]      The March 12, 2020, hearing was before the Senate Subcommittee on Agriculture, Rural Development, Food and Drug Administration, and Related Agencies.

6.      The DOJ and USDA investigations reflect activities by federal agencies with limited resources.  Accordingly, there is no assurance that either the DOJ or USDA will commence criminal or other proceedings against Defendants.[4] However, at a minimum, the existence of one or both investigations support the plausibility of Plaintiffs' claims in this Complaint.

7.      The Government's concern over the impact of Defendants' anticompetitive conduct in the cattle and beef market was laid bare in a June 2021 letter from 26 U.S. Senators to the DOJ.  In that letter, the Senators, asked "the government to determine whether the stranglehold large meatpackers have over the beef processing market violate our antitrust laws and principles of fair competition." They described Defendants' actions as follows: "From our perspective, the anticompetitive practices occurring in the industry today are unambiguous and either our antitrust laws are not being enforced or they are not capable of addressing the apparent oligopoly that so plainly exists."  The letter also noted that "[f]or far too long, cattle producers and consumers have been hurt by the increasing concentration of market power and anticompetitive actions of just a few meatpacking companies. Their collective power over the cattle and beef processing industry allows them to

---

[4]      Recently, a coalition of elected officials have called on the USDA and DOJ to provide an update on their investigations. *See* https://www.marshall.senate.gov/newsroom/press-releases/kansas-delegation-calls-on-usda-and-doj-to-provide-update-on-investigation-of-the-meat-packing-industry/ (last accessed on August 18, 2022).

seemingly control prices at their will." The Senators requested the DOJ and the USDA to investigate potential market manipulation and other illegal activity by Defendants.

8.      Plaintiffs understand from recently unsealed information and court filings in the litigation brought by cattle ranchers[5] that a confidential witness ("Witness 1"), who was previously employed by Swift at its Cactus, Texas slaughter plant, has confirmed the existence of a conspiracy among Defendants.

9.      Witness 1, who has been identified as Jason F., confirmed that all Defendants agreed to reduce their cattle purchases and slaughter volumes for the purpose and effect of increasing their margins (*i.e.*, the spread between what Defendants pay cattle ranchers for fed cattle and the price they charge Plaintiffs and other direct purchasers for beef).

10.     Information published by the USDA, and Defendants' public calls for industrywide slaughter and capacity reductions, corroborate Witness 1's account of Defendants' anticompetitive agreement.

---

[5]      Plaintiffs' allegations relating to Witness 1 and Witness 2 set forth in this Complaint are made upon information and belief based on allegations contained in the Third Consolidated Amended Class Action Complaint filed in the District of Minnesota by Plaintiffs, including the Ranchers Cattlemen Action Legal Fund, and the Court's Order denying Defendants' motion to dismiss. *Ranchers Cattlemen Action Legal Fund, et al. v. Tyson Foods, et al.*, No. 19-1222, DE 312 (D. Minn.); *In re Cattle Antitrust Litigation*, No. 20-cv-1319, DE 238 (denying motions to dismiss, based, at least in part, on similar allegations relating to Confidential Witness 1 and 2).

11.    In addition to the high concentration in the wholesale beef industry,[6] other structural characteristics of the domestic beef market facilitated Defendants' conspiracy.  Defendants sit atop the supply and distribution chain that ultimately delivers beef to the market.  More specifically, Defendants purchase cattle from the nation's feedlots, slaughter and pack cattle into beef, and ultimately sell beef to purchasers such as Plaintiffs.  Defendants' have exploited their pivotal role in the process of buying cattle to produce beef in order to collusively control upstream cattle pricing and downstream beef pricing during the Relevant Period.

12.    Other market characteristics serve as "plus factors" supporting the inference that Defendants conspired during the Relevant Period.  As explained more fully below, these characteristics include producer concentration, high barriers to entry, inelastic demand, the commodity nature of beef, frequent opportunities to conspire, strong demand, and/or market stability.  These economic factors made the market for the production and sale of beef conducive to cartelization.

13.    Defendants' increased profit margins during the time relevant to these allegations were aided by the way supply and demand operate in the beef industry. The supply of cattle is insensitive to short-term price changes because of the long

---

[6]    According to the Senators' June 2021 letter to the DOJ, "The U.S. meatpacking industry is more consolidated today than it was in 1921 when the Packers and Stockyards Act was enacted.  Four companies operate 18 of the top 20 beef slaughter facilities in this country, which constitutes 94% of this capacity." *See also supra* note 2.

lifecycle of cattle, cattle's perishable nature, and the lack of any alternative use for cattle. Beef demand is also relatively insensitive to price fluctuations. As a result, Defendants' margins were (and are) very responsive to changes in the aggregate volume of slaughtered cattle.

14. As alleged in detail below, by at least about the beginning of 2015, Defendants began exploiting favorable market conditions to launch their conspiracy. More specifically, Defendants began to coordinate on the prices they would pay for fed cattle. They also coordinated on their respective cattle slaughter volumes. Thus, over time, the output of beef was reduced resulting in higher beef prices for purchasers like Plaintiffs during the period relevant to these allegations. Industry data shows Defendants' transition from competition to collusion by managing the price of fed cattle and the industry slaughter volumes.

15. Starting in approximately 2015, the beef market experienced a change in price behavior. Before 2015, prices of cattle and beef predictably moved in tandem, which was the natural economic relationship in a competitive market because beef is processed cattle.

16. But beginning in approximately 2015, this fundamental economic relationship between cattle and beef prices changed. The degree of correlation of cattle and beef prices diverged (to Defendants' benefit) without any credible, non-

collusive explanation.  The relevant supply and demand factors in the industry no longer explained the prices charged to direct purchasers such as Plaintiffs.

17.    Starting in 2015, the margins earned on beef sales sold directly to purchasers such as Plaintiffs began to show trends that can now been seen as unusual.  The per-pound price of cattle had historically stayed within 20 to 40 cents of the per-pound average wholesale price of beef.  However, in 2015, the spread between those prices increased significantly, as demonstrated by Figures 1 and 2 below.

**Figure 1**



*Source: USDA*

**Figure 2**

| Years | Farm to Wholesale Price Spread | Proportional Increase |
|---|---|---|
| 2010 - 2014 | $34.10 | |
| 2015 -2019 | $60.20 | 77% |
| 2020 | $122.00 | 103% |
| 2021 | $156.50 | 28% |

18.     According to USDA Economic Research Service data, the average spread between the average farm value of cattle and wholesale value of beef was substantially higher from January 2015 through 2021 than during the preceding five years.  From 2010 to 2014, the average farm-to-wholesale spread was about $34.  But from 2015 to 2021, the average spread was about $82.8 – a 143% increase.

19.     Defendants' ability to reduce the prices of fed cattle over time while maintaining inflated beef prices during the period relevant to these allegations provides compelling, circumstantial evidence of their conspiracy.  In a competitive beef market, if a competitor reduces its price paid for fed cattle, then other competitors would be expected to increase purchases so they could boost output and increase their profit and market shares.

20.     In such a competitive environment, a competitor would not cut its cattle prices and suffer lost beef sales.  Only colluding meatpackers would expect to benefit by reducing their prices and purchases of slaughtered cattle, because they

would know that their conspiracy would shield them from the dynamics of a competitive marketplace. By collusively underpaying suppliers for fed cattle, and over time reducing beef output, Defendants have been able to increase their margins and profit, confident that none of them would grab volume from each other.

21.     United by their conspiracy, Defendants were confident that none of them would defect and disproportionately expand their beef production to satisfy unmet demand. Armed with this assurance, Defendants achieved unprecedented meat margins (*i.e.,* the gap between what they paid for cattle and what they charged for beef sold to direct purchasers like Plaintiffs).

22.     For example, by the end of 2021, the two largest Defendants, Tyson Foods and JBS USA, were reporting record margins or net revenue in their beef business. Tyson Foods reported that its beef business' operating margin was nearly 18% percent – nearly nine times its 2014 operating margin of 2.1%. Meanwhile, JBS USA reported net revenue of $27.18 billion in 2021, which is a 25.8% increase over its $21.6 billion it reported for its beef operation in 2014.

23.     Given these bloated margins, it is unsurprising that a leading industry reporter remarked that Defendants "no longer compete against each other," which has enabled them to reap "gangbuster profits."[7]

---

[7]     Cassandra Fish, "Whatever Happened to a Fair Fight," The Beef (Nov. 10, 2015), https://www.thebeefread.com/2015/11/10/whatever-happened-to-a-fair-fight/.

## II.   JURISDICTION AND VENUE

24.     Plaintiffs bring this action under Sections 4(a) and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 308 of the Packers and Stockyard Act ("PSA"), 7 U.S.C. § 209, for the injuries sustained by each Plaintiff as for a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1 and Section 202 of the PSA, 7 U.S.C. § 192.

25.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1337, Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 308 of the PSA, 7 U.S.C. § 209.

26.     Venue is proper in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26 and 28 U.S.C. § 1391(b), (c) and (d), and Section 308 of the PSA, 7 U.S.C. § 209, because: (a) one or more Defendants resides or resided, is found, transacts or transacted business in in this District, or is licensed to do business or is doing business in this District; (b) a substantial portion of the affected interstate commerce described in this Complaint occurred in this District; (c) each Defendant is subject to personal jurisdiction in this District; and/or (d) to the extent that there is no District in which this action may otherwise be brought, then venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because one or more Defendants is/are found in this District.

27.    This Court has personal jurisdiction over each of the Defendants because, among other reasons, each Defendant (a) inhabits, transacts business in, has continued or systematic contacts with, or is found in this District; (b) has sufficient minimum contacts in the United States, sufficient to satisfy due process; (c) manufactured, sold, shipped, and delivered or directed the manufacture, sale, shipment, and delivery of substantial quantities of beef throughout the United States, including in this District; (d) belonged to the conspiracy alleged in this Complaint, and one or more of them, and their co-conspirators, performed unlawful acts in furtherance of the conspiracy in this District, including without limitation, selling beef to one or more Plaintiffs and others in this District at artificially inflated prices; and/or (e) engaged in unlawful conduct that was directed at, and had a direct, foreseeable, and intended effect of causing injury to, the business or property of persons residing in, located in, or doing business throughout the United States, including in this District.

## III.    **PARTIES**

### A.    **Plaintiffs**

28.    Plaintiff The Kroger Co. ("Kroger") is an Ohio corporation with its principal place of business in Cincinnati, Ohio.  Kroger brings this action on its own behalf and on behalf of its assignors (including, without limitation: Kroger Limited Partnership I; KRGP Inc.; Kroger Texas L.P.; The Kroger Co. of Michigan; Fred

Meyer, Inc.; Fred Meyer Stores, Inc.; Food 4 Less Holdings, Inc.; Ralph's Grocery Company; Smith's Food & Drug Centers, Inc.; Dillon Companies, LLC; Dillon Companies, Inc.; Roundy's Inc.; Junior Food Stores of West Florida, Inc.; Kroger Limited Partnership II; FMJ, Inc.; Healthy Options, Inc.; Pay Less Super Markets, Inc.; City Market, LLC; Harris Teeter, Inc.; Harris Teeter Supermarkets, Inc.; and Harris Teeter, LLC), each of which directly purchased beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint. The reference in this Complaint to "Kroger" refers to The Kroger Co. and its assignors. Kroger owns and operates retail stores that sell beef. During the time period relevant to Plaintiffs' claims, Kroger directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

29.     Plaintiff Hy-Vee, Inc. ("Hy-Vee") is an Iowa corporation with its principal place of business in West Des Moines, Iowa. Hy-Vee brings this action on its own behalf, on behalf of certain subsidiaries, including Perishable Distributors of Iowa, Ltd., and on behalf of its assignor (Topco Associates, LLC), each of which directly purchased beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint. The reference in this Complaint to "Hy-Vee" includes Hy-Vee's subsidiaries and assignor. Hy-Vee owns and operates

retail stores that sell beef.  During the time period relevant to Plaintiffs' claims, Hy-Vee and its subsidiaries, and Topco, directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

30.     Plaintiff Save Mart Supermarkets LLC ("Save Mart") is a California limited liability corporation with its principal place of business in Modesto, California.  The reference in this Complaint to "Save Mart" refers to Save Mart Supermarkets and banners under which it does business, including, without limitation, Save Mart, Lucky Supermarkets, FoodMaxx, and MaxxValue Foods. Save Mart owns and operates retail stores that sell beef.  During the time period relevant to Plaintiffs' claims, Save Mart directly purchased beef in the United States from one or more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

31.     Plaintiff US Foods, Inc. is a Delaware corporation ("US Foods") with its principal place of business in Rosemont, Illinois.  US Foods is a food distributor that sells beef.  During the time period relevant to Plaintiffs' claims, US Foods, including its subsidiaries, directly purchased beef in the United States from one or

more Defendants and/or their co-conspirators and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

32.     Plaintiff Albertsons Companies, Inc. is a Delaware limited liability company with its principal place of business in Boise, Idaho.  Albertsons Companies, Inc. is the parent corporation of Albertsons LLC, New Albertsons Inc., and Safeway Inc. (collectively "Albertsons").  Albertsons Companies, Inc. brings this action on its own behalf and on behalf of its assignors (including, without limitation: Safeway Inc.; Balducci's Food Lovers Markets; Carr-Gottstein Foods Co.; Dominick's Finer Foods, LLC; Genuardi's Family Markets LP; Kings Food Markets; Lucerne Foods, Inc.; Randall's Food & Drugs LP; The Vons Companies, Inc.; New Albertsons, Inc.; Albertsons LLC; ACME Markets, Inc.; Jewel Food Stores, Inc.; Shaw's Supermarkets, Inc.; United Supermarkets, LLC; American Stores Company, LLC; American Drug Stores Delaware, LLC; American Drug Stores LLC; and Star Market Company, Inc.), each of which directly purchased beef from one or more Defendants and their co-conspirators during the conspiracy alleged in this Complaint.  The reference in this Complaint to "Albertsons" includes Albertsons' assignors.  Albertsons owns and operates retail stores that sell beef. During the time period relevant to Plaintiffs' claims, Albertsons directly purchased beef in the United States from one or more Defendants and/or their co-conspirators

and sustained injury and damage as a proximate result of the conduct and violations of law alleged in this Complaint.

33.    Each Plaintiff is a "person" with standing to sue Defendants for damages and other relief under Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) & 26, and Section 209(b) of the Packers and Stockyards Act, 7 U.S.C. § 209(b).

### B.    Defendants and Their Subsidiaries and Affiliates

34.    The term "Defendants" includes Defendants and all their predecessors, successors, assigns, including cattle purchasers and beef meatpackers that merged with or were acquired by any Defendant, and each Defendant's current or former wholly owned or controlled subsidiaries or affiliates that bought cattle or sold beef in interstate commerce directly to purchasers in the United States, including this District, during the Relevant Period.

35.    Each Defendant bought cattle (*i.e.*, livestock, and therefore is a "packer" under the PSA), and sold or distributed beef to direct purchasers and/or participated in the conspiracy alleged in this Complaint.  All Defendants were active, knowing participants in the alleged conspiracy, and their conduct, to the extent committed by Defendants, was known to, and approved by, their co-Defendant parent companies.

1.    The Cargill Defendants

36.    Defendant Cargill, Inc. ("Cargill") is a privately held Delaware corporation with its principal place of business at 15407 McGinty Road, Wayzata, Minnesota 55391.  During the Relevant Period, Cargill, Inc. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through Cargill, Inc.'s wholly owned or controlled affiliates, to purchasers in the United States.  Cargill, Inc. is the parent company of CMS.

37.    Defendant Cargill Meat Solutions Corporation (a/k/a Cargill Protein) (a/k/a Cargill Protein – North America) ("CMS") is a wholly-owned Cargill subsidiary.  CMS is a Delaware corporation with its principal place of business at 825 East Douglas Avenue, Wichita, Kansas 67202.  CMS is the principal operating entity within Cargill's U.S. cattle and beef business.  CMS owns directly, or indirectly through its subsidiaries, Cargill's U.S. fed cattle slaughter plants, and contracts for the purchase of cattle slaughtered there.

38.    During the time period relevant to Plaintiffs' claims, Cargill wholly owned CMS, as a direct or indirect subsidiary, and sold, along with CMS, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States.

39.    During the time period relevant to Plaintiffs' claims, Cargill and CMS (collectively, "Cargill Defendants") shared a unity of corporate interest and operated

as part of a single enterprise in furtherance of the conspiracy alleged in this Complaint that purposefully directed conduct causing injury to and derived direct benefit from purchasers in the United States and this District.

### 2. The JBS Defendants

40. Defendant JBS S.A. is a Brazilian corporation with its principal place of business at Av. Marginal Direta do Tiete, 500 Bloco 3-30 andar, Vila Jaguara, Sao Paulo 05.118-100, Brazil. During the time period relevant to Plaintiffs' claims, JBS S.A. and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through JBS S.A.'s wholly owned or controlled affiliates, to purchasers in the United States. JBS S.A. is the parent company of JBS USA, Swift, and Packerland.

41. JBS USA Food Company Holdings ("JBS USA") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. JBS USA is the principal operating entity of JBS S.A.'s U.S. cattle-and-beef business. On information and belief, it is the principal operating entity within JBS S.A.'s United States cattle and beef business and the contracting entity for certain of JBS S.A.'s purchases of fed cattle in the United States.

42. Defendant Swift Beef Company ("Swift") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634. Swift owns directly, or indirectly through its subsidiaries, certain of JBS

S.A.'s United States fed cattle slaughter plants including the Cactus, Texas; Greeley, Colorado; Grand Island, Nebraska; and Hyrum, Utah plants.  On information and belief, Swift contracts for the majority of fed cattle to be slaughtered at these plants.

43.     Defendant JBS Packerland, Inc. ("Packerland") is a Delaware corporation with its principal place of business at 1770 Promontory Circle, Greeley, Colorado 80634.  On information and belief, Packerland owns directly, or indirectly through its subsidiaries, certain of JBS S.A.'s United States fed and dairy cattle slaughter plants, including the Packerland packing plants in Green Bay, Wisconsin and Plainwell, Michigan, the Sun Land beef plant in Tolleson, Arizona, and the Moyer Packing plant in Souderton, Pennsylvania.   On information and belief, Packerland contracts for the majority of fed cattle to be slaughtered at these plants. Packerland operates a Regional Beef business unit.

44.     Various senior staff and executives responsible for the operation of JBS S.A.'s United States fed cattle and beef business during the time period relevant to Plaintiffs' claims were employed by each of JBS USA, Swift, and Packerland (collectively with JBS S.A., the "JBS Defendants").

45.     During the time period relevant to Plaintiffs' claims, JBS S.A., along with and/or through its wholly-owned direct or indirect subsidiaries – JBS USA, Swift, and Packerland – sold beef in interstate commerce, directly or through these wholly owned or controlled affiliates, to purchasers in the United States.

46.     During the time period relevant to Plaintiffs' claims, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy alleged in this Complaint that purposefully directed conduct causing injury to and derived direct benefit from purchasers in the United States and in this District.

### 3.     The Tyson Defendants

47.     Tyson Foods, Inc. ("Tyson Foods") is a publicly traded Delaware corporation headquartered in Springdale, Arkansas.  During the time period relevant to Plaintiffs' claims, Tyson Foods and/or its predecessors, wholly owned or controlled subsidiaries, and/or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

48.     Defendant Tyson Fresh Meats, Inc. ("Tyson Fresh") is a wholly owned subsidiary of Tyson Foods.  Tyson Fresh is a Delaware corporation with its principal place of business at 800 Stevens Port Drive, Dakota Dunes, South Dakota 57049. Tyson Fresh is the principal operating entity within Tyson Foods' U.S. cattle and beef business.

49.     On information and belief, Tyson Fresh owns directly, or indirectly through its subsidiaries, Tyson Foods' U.S. fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

50.     During the time period relevant to Plaintiffs' claims, Tyson Foods wholly owned Tyson Fresh as a direct or indirect subsidiary, and sold, along with Tyson Fresh, beef in interstate commerce, directly or through this wholly owned or controlled affiliate, to purchasers in the United States.

51.     During the time period relevant to Plaintiffs' claims, the Tyson Foods and Tyson Fresh (together, "Tyson Defendants") shared a unity of corporate interest and operated as part of a single enterprise in furtherance of the conspiracy alleged in this Complaint that purposefully directed conduct causing injury to and derived direct benefit from purchasers in the United States and in this District.

### 4.     National Beef Packing Company

52.     National Beef Packing Company LLC ("National Beef") is a privately owned Delaware limited liability company with its principal place of business located at 12200 North Ambassador Drive, Suite 500, Kansas City, Missouri 64163. National Beef and/or its predecessors, wholly owned or controlled subsidiaries, or affiliates sold beef in interstate commerce, directly or through its wholly owned or controlled affiliates, to purchasers in the United States.

53.     On information and belief, National Beef owns directly, or indirectly through its subsidiaries, National Beef's United States fed cattle slaughter plants and contracts for the purchase of cattle slaughtered there.

### C.    Defendants' Co-Conspirators

54.    Unknown persons, firms, and entities not named as Defendants in this Complaint participated as co-conspirators with Defendants and performed acts and made statements in furtherance of Defendants' conspiracy.  Defendants are jointly and severally liable for the acts of their co-conspirators, whether or not Plaintiffs have named these co-conspirators as defendants.

### D.    Reciprocal Agency of Defendants and Co-Conspirators

55.    Each Defendant and co-conspirator acted by or through its officers, directors, agents, employees, or representatives while actively engaged in the management, direction, control, or transaction of the company's business or affairs.

56.    Each Defendant and co-conspirator acted as the agent of the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct Plaintiffs allege in this Complaint.

### E.    Defendant Parent and Subsidiary Companies Share a Unity of Interests

57.    The coordinated activity of a parent and its wholly owned subsidiary is viewed as that of a single enterprise for purposes of Section 1 of the Sherman Act.

58.    A parent and its wholly-owned subsidiary have a complete unity of interest and purpose.  Their objectives are common, not disparate, and their general corporate actions are guided or determined by one corporate consciousness.

Accordingly, the coordinated activity of a parent and its wholly-owned subsidiary is conduct of a single enterprise.

59.     By controlling, dictating, or encouraging their subsidiaries' anticompetitive conduct in advancement of a common scheme for an illegal and anticompetitive purpose, the parent Defendants independently participated in the illegal enterprise alleged in this Complaint.  In doing so, the parent Defendants engaged in sufficient independent conduct and had sufficient knowledge, intent, and involvement in Defendants' conspiracy to be liable under the Sherman Act as a single enterprise with their subsidiaries.

1.     <u>The Cargill Defendants</u>

60.     Cargill created CMS to conduct its business in the meat industry that Cargill previously operated itself.

61.     Cargill presents itself and its subsidiaries to the public as a single unified enterprise.  For example, in its Letter to Stakeholders included in Cargill's 2021 Annual Report, it explains, in a section entitled "How we work," that "[o]ur integrated operating approach enables our businesses to provide industry-leading products and services in their specific sections while also drawing on the full work of Cargill's expertise."  Additionally, on its website, Cargill reports that it employs 155,000 workers in 70 countries.  Plaintiffs are informed and therefore believe and allege that these numbers include CMS employees.  Cargill has also publicly

announced consolidated revenues, earnings, and cash flow that Plaintiffs believe include CMS's beef operations.

62.     In the Letter to Stakeholders included in Cargill's 2019 Annual Report, Cargill reported that it "delivered $2.82 billion in adjusted operating earnings in fiscal 2019…. Revenues dipped 1% to $113.5 billion. Cash flow from operations totaled $5.19 billion." On information and belief, those statistics include earnings, revenues, and cash flows from all Cargill subsidiaries as well as Cargill itself. In the same document, Cargill reported that its "[e]arnings were led by our North American protein businesses. With steady domestic and export demand, and plentiful cattle supplies, the beef business posted its third consecutive year of strong performance."

63.     A single unified system processes both companies' purchase orders, which further demonstrates the intertwined relationship between Cargill and CMS. Cargill also operates other business services, including information technology, human resources, finance, transportation and logistics, and procurement, with and for CMS.

64.     Cargill plays an active role in managing CMS's business operations. For example, Cargill's 2021 Annual Report states that its Executive Team is responsible for the company's strategic direction, talent development and overall

financial performance" and it is "[l]ed by Board Chari and CEO David MacLennan…."

65.    Cargill's slaughter plants in Fresno, California, Wyalusing, Pennsylvania, and Friona, Texas all list either "Cargill" or "Cargill Beef" as DBAs with the USDA Food Safety Inspection Service.

66.    Cargill's extensive involvement in CMS's management and operations demonstrates these entities' unity of purpose (*e.g.*, to profit from their price fixing) and common objectives.   Cargill's involvement in CMS's management and operations demonstrates that Cargill created CMS as its instrumentality to execute Cargill's directives.  During the time period relevant to Plaintiffs' claims, Cargill exerted, and had the right to exert, control over CMS.  Thus, Cargill independently participated in the illegal enterprise with CMS and, accordingly, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with CMS as a single enterprise.

## 2.    The JBS Defendants

67.    JBS S.A. is not merely a holding company whose business is restricted to investments in operating subsidiaries.   JBS S.A. established or acquired subsidiaries, including JBS USA (which it formed), Swift (which it acquired), and Packerland (which it acquired), to conduct its business, including the purchase and

processing of cattle and the sale of beef. Had JBS S.A. not created or acquired these subsidiaries, it would have performed these functions itself.

68. JBS S.A. presents itself as a unified enterprise and conducts consolidated earnings calls on which its corporate representatives discuss the operations and profits of JBS S.A., including JBS USA, Swift, and Packerland. On these calls, JBS S.A. executives have described the beef business it conducts through JBS USA, referring to it as "JBS beef" and as a "division" or "business unit." JBS S.A. states on its website that it "produces and sells beef through two Business Units: Friboi, in Brazil, and JBS USA Beef." As reported on JBS USA's financial statements, JBS USA conducts its United States beef and pork processing businesses through its wholly-owned subsidiaries Swift and JBS Packerland.

69. During time relevant to the claims in this Complaint, JBS USA's CEO and President reported directly to JBS S.A.'s President and Chief Executive of Global Operations and also its CEO.

70. Defendants Swift and Packerland are fully integrated into the JBS USA enterprise. They are under the complete control of JBS USA, and in turn, JBS S.A. JBS USA's financial statements are replete with references to notes, loans, and credit facilities that are guaranteed by their parent, JBS S.A.

71. Credit rating agencies have also factored in rating JBS USA in connection with issuance of notes that are guaranteed by JBS USA's parent, JBS

S.A.  For example, recently, credit rating agency Moody's reported that JBS USA was a co-issuer (along with two other JBS related entities) of proposed $500 million senior unsecured 10-year notes that will be guaranteed by the parent, JBS S.A.

72.    Swift's and JBS Packerland's packing operations are presented as those of JBS USA.  For example, they appear on USDA's list of Bonded Packers as "JBS USA Food Company, Swift Beef Company" and "JBS USA Food Company, JBS Packerland, Inc.," respectively.  The USDA's Food Safety and Inspection Service's Inspection Directory lists "JBS," "JBS USA," and "JBS USA Food Company" amongst other DBAs for Swift.

73.    JBS S.A.'s extensive involvement in JBS USA's, Swift's, and Packerland's management and operations demonstrates these entities' unity of purpose (*e.g.*, to profit from their price fixing) and common objectives.  JBS S.A.'s involvement in JBS USA's, Swift's, and Packerland's management and operations also reveal that these entities' general corporate actions are guided and determined by one corporate consciousness.  JBS S.A. does more than provide long-term strategy and guidance to JBS USA, Swift, and Packerland.  The entire purpose of these subsidiaries is to serve as JBS S.A.'s instrumentalities for executing JBS S.A.'s directives within the greater JBS enterprise.  During the period relevant to Plaintiffs' claims, JBS S.A. exerted, and had the right to exert, total control over JBS USA, Swift, and Packerland.  In this manner, JBS S.A. independently participated in the

unlawful enterprise with JBS USA, Swift, and Packerland.  Accordingly, JBS S.A. has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act as a single enterprise with JBS USA, Swift, and Packerland.

### 3.    The Tyson Defendants

74.    Tyson Foods is not a mere holding company whose business is restricted to investments in operating subsidiaries.  Rather, Tyson Foods formed subsidiaries to act as its agents and representatives to conduct business activities that Tyson Foods would have otherwise conducted.  With respect to Tyson Foods' subsidiary Tyson Fresh, such activities include purchasing and processing cattle and selling beef.

75.    Tyson Foods holds itself out to the public as a single unified enterprise, describing the beef business it conducts through Tyson Fresh as a mere "business unit."

76.    On its quarterly earnings calls, Tyson Foods' corporate representatives include Tyson Fresh when discussing the company's financial performance.  On these calls, Tyson Foods announces operating income and returns on sales from its beef segment business that Tyson Fresh operates.  Specifically, on earnings calls, Tyson Foods attributes improved returns to actions at plants that Tyson Fresh owns and operates.

77.   During a January 31, 2014, earnings call, Tyson Foods management employees explained to investors that Tyson Foods had generated $58 million in operating income and a 1.6% return on sales from its beef segment business, despite that business being operated directly by Tyson Fresh Meats.  On the same call, Tyson Foods' managers stated that "as the calf crop declines ... [we'll] probably have to curtail production."  Production of beef from the calf crop is an activity which is undertaken by Tyson Fresh.

78.   On other earnings calls, Tyson Foods has described actions taken by Tyson Fresh to advance Defendants' conspiracy.  For example, on its August 10, 2015, earnings call, Tyson Foods explained its strategy for cattle purchasing implemented by Tyson Fresh as "we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs."

79.   Similarly, on Tyson Foods' May 7, 2018, earnings call, with respect to beef production plants owned and operated by Tyson Fresh, Tyson Foods explained that "[w]e had to stop production[], [w]e had to close plants several times in the quarter, not every plant, but several plants several times in the quarter."

80.   Tyson Foods and Tyson Fresh also guarantee each other's debts. Tyson Fresh has issued multiple debt securities guaranteed by Tyson Foods.  In a registration statement filed with the SEC in 2009, Tyson Foods notified investors

that Tyson Fresh pledged not only its own assets to guarantee debt instruments, but also those of Tyson Foods and certain "other domestic operation subsidiaries of Tyson [Foods]."

81. Similarly, in a 2014 prospectus filed with the SEC, Tyson Foods stated that Tyson Fresh would act as a guarantor of Tyson Foods' debt securities, including debentures, notes, and all other types of debt. Tyson Foods has issued multiple senior notes under this arrangement.

82. Finally, in registrations with the USDA's Food Safety Inspection Service, Tyson Fresh slaughter plants in Dakota City, Nebraska, Lexington, Nebraska, Amarillo, Texas, identify Tyson Foods as a business name of Tyson Fresh.

83. Tyson Foods' extensive involvement in Tyson Fresh's management and operations demonstrates these entities' unity of purpose (*e.g.*, to profit from their price fixing) and common objectives. Tyson Foods' involvement in Tyson Fresh's management and operations also reveals that these entities' general corporate actions are guided and determined by one corporate consciousness. Tyson Foods does not merely provide long-term strategy and guidance to Tyson Fresh. Tyson Fresh's entire purpose is to execute Tyson Foods' directives within the greater Tyson enterprise and to serve as an instrumentality of Tyson Foods. During the time relevant to Plaintiffs' claims, Tyson Foods exerted, and had the right to exert, control

over Tyson Fresh.  In this manner, Tyson Foods independently participated in the unlawful enterprise with Tyson Fresh and, as a result, has sufficient knowledge, intent, and involvement in Defendants' conspiracy to be found liable under the Sherman Act with Tyson Fresh as a single enterprise.

## IV.    INDUSTRY BACKGROUND

84.    The United States is the largest producer of beef in the world – primarily "high quality, grain-fed beef for domestic and export use."[8]

85.    The market for fed cattle in the United States is substantial.  In 2017 alone, for example, 25.8 million fed cattle were slaughtered and processed into beef products, which accounted for 80% of the 32.2 million commercial cattle slaughtered across the United States.[9]

86.    The size of cattle herds in the United States is influenced by what is known as the "cattle cycle," which is a process in which the size of the national cattle herd increases and decreases over time.  Variation in herd size is often caused by the lengthy gestation period of cattle relative to hogs and poultry, which constrains cattle producers' response to profit fluctuations.  In general, the cattle cycle is determined

---

[8]    *See* the "Cattle & Beef" section of the USDA website (hereafter "USDA Cattle & Beef"), *available at* https://www.ers.usda.gov/topics/animal-products/cattle-beef/.

[9]    The remaining volume is comprised of slaughter cows (female cattle that have birthed a calf) and bulls, whose meat is typically used for lesser quality beef products such as ground beef.

by the combined effects of cattle prices, the gestation period, the time needed for raising calves to market weight, and climatic conditions.  If cattle producers expect the price of cattle to be high, they slowly build up their herd sizes, but if they expect prices to be low, they will reduce their herds by culling older cows and keeping fewer heifers.

87.     Production of cattle raised for beef takes considerable time and investment. The cattle production cycle, running from birth to slaughter, typically ranges between 15 to 24 months, and is the longest of all animals raised for meat. Fed cattle progresses through three interrelated stages prior to slaughter: cow/calf, stocking and background, and feedlots.  Calves are first raised by their mothers for about six months.  When they weigh about 500 pounds, the calves are weaned and sold to the stocker-yearling sector where they eat a diet of forage, wheat pasture, and sileage.  When a steer or heifer reaches 600-800 pounds, it is sold to a feedlot where it eats corn and protein supplements in addition to roughage.

88.     Once cattle reach approximately 1,200 - 1,400 pounds, they are sold as fed cattle to the beef producers/packers, including Defendants.  Defendants and other beef producers/packers then slaughter and process the cattle into edible boxed beef and primal and smaller case-ready consumer cuts.  A steer weighing 1,200 pounds typically yields about 490 pounds of edible beef.

89.    Cattle are sold to beef processors, including Defendants, through two channels. About 70 percent of cattle are sold through supply contracts (known as captive-cattle agreements) with feedlots or, to a lesser extent, ranching operations. The rest of the cattle are sold on the spot market, which is typically the benchmark for prices of cattle sold under captive-cattle agreements.  Thus, by increasing the volume of cattle they purchased under captive-cattle agreements, and decreasing their spot purchases, Defendants, with their considerable market power, were able to depress the price they paid under both spot and captive-cattle agreements.

90.    In the final stage of the farm to market journey, Defendants and other meatpackers sell the beef to wholesalers, grocery chains, food distributors, restaurants, and other large retailers, including Plaintiffs.

91.    On information and belief, during the time relevant to Plaintiffs' claims, Tyson Fresh, JBS USA, Swift, Packerland, CMS, and National Beef each conducted daily meetings, typically from their head office, attended by representatives of their respective cattle procurement, plant operations, scheduling, beef sales, and risk management teams, among others, to make decisions regarding their respective cattle and beef operations.  Among other matters, the attendees at these meetings discussed the number of cattle their fed cattle business will procure, the terms on which they would be bought, plant scheduling (including slaughter volume) across each of their slaughter facilities, and beef sales strategy.

92.     Because the cost of beef production is predominately made up of the cost of fed cattle, Defendants' profitability is driven by the "meat margin," which is the spread between the price they pay for fed cattle and the price they charge for beef.  The meat margin is sensitive to changes in industry aggregate slaughter levels, and Tyson Fresh, Swift, Packerland, CMS, and National Beef can (and have through collusion) increased it.  As noted by the DOJ, "[a]ll else being equal, when the meat packing industry reduces production levels, feedlots and cattle producers are paid less for fed cattle because fewer fed cattle are demanded and customers pay more for [] beef because less is available for purchase.  Because the supply of fed cattle and demand for [] beef are relatively insensitive to short term changes in price, even small changes in industry production levels can significantly affect packer profits."[10]

93.     As a result of these sensitivities, Tyson Fresh, Swift, Packerland, CMS, and National Beef, on behalf of their respective Defendant parent companies, can (and did) improve their profitability by coordinating what they paid for slaughter-ready cattle and the resulting supply of fed cattle, at the expense of buyers of beef, including Plaintiffs, who paid more than they would have but for Defendants' illegal conduct.

---

[10]     *U.S. v. JBS*, No. 08-cv-5992 (N.D. Ill.), ECF No. 48 ("Amended Complaint"), ¶¶ 26-27.  *See also* Section VII(B) below regarding the elasticities of fed cattle and beef.

## V.   **DEFENDANTS' ANTITRUST VIOLATIONS**

94.   By approximately late 2014 or early 2015, Defendants were experiencing shrinking profit margins on their beef sales.  In earnings calls or annual reports, the two largest Defendants, Tyson Foods and JBS S.A., reported slumping profitability of their beef operations.

95.   For example, on a November 7, 2014, earnings call, Tyson Foods reported a quarterly operating margin that was less than half the margin enjoyed by its poultry division.  Similarly, in its 2014 Earnings Release, JBS S.A. announced that its US beef segment (JBS USA) was underperforming relative to its chicken segment (which had "performed really well in 2014") and pork segment (which in 2014 was the "best result in the pork industry in the US").  Its beef quarterly margin was less than one-third of its chicken segment and less than one-half of its beef segment's margin.

96.   Rather than trying to improve profitability through independent conduct pursuant to unilateral business interests, Defendants instead agreed to collectively reduce and manage their respective slaughter volumes, which, in turn, resulted in a reduction in the supply of beef.  The artificial beef shortages ushered in a new era of supracompetitive prices paid by Plaintiffs and other direct purchasers of beef.

A. **Direct Evidence of Defendants' Conspiracy**

97.    Information recently unsealed in public filings confirms Defendants' conspiracy, as witnessed by a former Swift employee, known as Witness 1.  The allegations below concerning Witness 1 are based on those filings and other recently unsealed information.

98.    Based on conversations with James Hooker, head of fabrication at Swift's Cactus, Texas plant, Witness 1 states that Defendants agreed with each other to periodically reduce their respective purchase and slaughter volumes, resulting in beef prices above competitive levels paid by direct purchasers, including Plaintiffs.

99.    During his decade-long employment, including several years during the time relevant to Plaintiffs' claims, Witness 1 was a head quality assurance officer with primary responsibility for the Swift plant's kill floor, hotboxes, and coolers. The kill floor is where cattle are slaughtered and dressed, *i.e.*, where head, hide, and internal organs removed.  The carcasses are then moved to the hotboxes to cool down, before being stored in the coolers ahead of fabrication, where they are broken down into smaller cuts.

100.   According to Witness 1, he learned of Defendants' collusive purchase and slaughter reduction agreement from Mr. Hooker, who was employed as the head of fabrication at the same Cactus, Texas plant as Witness 1.  As explained below,

37

Mr. Hooker was positioned to know (and did know) about Defendants' unlawful agreement.

101.   Witness 1 regularly spoke with Mr. Hooker before starting his shift to learn the slaughter and fabrication numbers for that day and the upcoming days, which Witness 1 and his team needed to execute their responsibilities, including the placement of his team, arrangement of hotbox and cooler space, the number of carcasses they would process through the hotbox and coolers that day, and interactions with USDA inspectors.

102.   In addition to the fabrication plan, Mr. Hooker, like Witness 1, also needed to understand the number of cattle scheduled to be slaughtered each day. Among other matters, if the kill volume was lower but the price of beef remained favorable, the fabrication floor would continue to process carcasses at typical rates. However, when kill volumes were reduced and the price of beef was unfavorable, Mr. Hooker may order the carcasses to stay longer in the hot boxes and coolers before being processed into beef cuts to improve grading performance.  In such a case, Witness 1 and his team would allow more space between each carcass in the hot boxes.

103.   But if the kill volume was higher, Mr. Hooker increased the number of carcasses processed.  To ensure there was sufficient space in the hot boxes and coolers, Witness 1 spaced the carcasses closer together when filling the hot boxes.

The number of carcasses expected to be put into the hot boxes also dictated the amount of air and water Witness 1 and his team used to ensure proper cooling speeds.

104.   In sum, it was essential for both Mr. Hooker and Witness 1 to know the plant's planned slaughter figures to coordinate and perform their core job duties. Witness 1 reported having had a "decent" working relationship with Mr. Hooker.

1.   <u>Mr. Hooker Was Positioned to Know About Defendants'<br>Unlawful Agreement</u>

105.   On information and belief, Mr. Hooker continues to work at Swift's Cactus, Texas plant, where he has worked for over 15 years, including a short stint as head of slaughter operations.  Witness 1 reports that before working for Swift in the early 2000s, Mr. Hooker worked at Tyson Fresh's Amarillo, Texas slaughter plant, where he was also responsible for beef fabrication.

106.   As a fabrication manager for Swift, Mr. Hooker reported directly to both Cactus's General Manager, Manny Guerrero, and directly to the beef production department of JBS USA/Swift/Packerland's head office in Greeley, Colorado.

107.   As head of fabrication, Mr. Hooker needed to be informed as to cattle buying/scheduling, cattle slaughter, and beef selling aspects of JBS USA/Swift/Packerland's fed cattle business.  Mr. Hooker also spoke directly to other

managers within the JBS corporate office about plant operations, including scheduled slaughter and fabrication volumes, and fabrication priorities.

108.   For example, during the time relevant to Plaintiffs' claims, Mr. Hooker regularly spoke directly to Mr. Sergio Sampaio Nogueira, Head of Operations and Executive Vice President of Beef Operations at JBS, when Mr. Nogueira visited the Cactus, Texas plant.   Witness 1 understands that Mr. Hooker also spoke to Mr. Nogueira at other times.   Mr. Hooker's contact with senior management confirms that JBS USA/Swift/Packerland senior executives maintained direct connection with plant-level managers, like Mr. Hooker, during the Relevant Period.

109.   Mr. Hooker, along with Ryan Wagnon (Head of Slaughter Operations at Cactus), was also responsible for operations at the Cactus, Texas plant in the absence of Mr. Guerrero and the Plant Engineer.   When acting as the Cactus, Texas plant's General Manager, Mr. Hooker worked closely with beef executives from across JBS's head office.   As such, Mr. Hooker regularly spoke to, and had a close working relationship with, high-ranking individuals at JBS.

110.   On information and belief, in addition to having corporate information for JBS, Mr. Hooker had information regarding other Defendants.   Mr. Hooker regularly told Witness 1 that he was in contact with his former colleagues at Tyson Fresh's Amarillo, Texas plant, including his replacement there.   Mr. Hooker also told Witness 1 that he had friends and former colleagues at other Defendants' plants

with whom he stayed in touch.  Mr. Hooker often provided Witness 1 with detailed information regarding current and future operations of Tyson Fresh's, CMS's, and National Beef's nearby packing plants.

### 2.   Witness 1 Learns of Defendants' Unlawful Agreement

111.   During the Relevant Period, Witness 1 reports having multiple discussions with Mr. Hooker during which Mr. Hooker explained that Defendants reduced their purchase and slaughter volume to reduce fed cattle prices when Defendants viewed fed cattle prices as being or becoming "too high" for their liking. During one such conversation in 2015, Mr. Hooker specifically admitted that Defendants had an "agreement" to reduce their purchase and slaughter volumes in response to what they perceived to be high cattle prices.

112.   According to Witness 1's account, he was in Mr. Hooker's office when Mr. Hooker received an angry phone call from his immediate supervisor who worked out of JBS USA/Swift/Packerland's central office in Greeley, Colorado. After the call concluded, Witness 1 asked Mr. Hooker how "many are we [Swift's Cactus plant] cutting [*i.e.*, fabricating]?"  Witness 1 reports that Mr. Hooker replied the "cut" was going to be steady that day, but that the "kills are getting cut back, [because the] price is getting too high" (or words to that effect).

113.   Witness 1 further reports that there was typically a lag between commencement of a slaughter reduction and the reduction of fabrication activities.

Among other reasons, this phenomenon reflected the fact that a slaughter plant's fabrication team had to continue processing the carcasses already hanging in the coolers.

114.   Witness 1 also recalls asking Mr. Hooker whether Swift's competitors were also cutting back their kill.   Witness 1 recalls that Mr. Hooker answered Witness 1's question as follows: "Yes, they are.   We have had that agreement that we don't kill while prices are up for a while" (or words to that effect).

115.   Witness 1 is certain that Mr. Hooker intended to convey that all Defendants were reducing their slaughter volumes by agreement, and not simply commenting on the fact that one or some of the Defendants had independently decided to reduce slaughter.

116.   Witness 1 stated that Swift's Cactus, Texas plant had a 5,500 - 6,000 head per day slaughtering capacity but might drop its kill level to around 4,800 - 5,200 head per day when implementing Defendants' unlawful agreement.   In furtherance of the agreement, Swift bought and slaughtered fewer cattle, which entailed running its slaughter plants at reduced hours, operating the plants at lower "chain speeds," and/or scheduling maintenance shutdowns.

117.   Witness 1 recalls management at Swift's Cactus, Texas plant, including Messrs. Guerrero and Wagnon, pretextually telling staff during periods of reduced slaughter during the time relevant to Plaintiffs' claims that kill levels were being

reduced in response to fed cattle prices.  As further described below, Defendants coordinated and agreed to refrain from expanding their slaughtering and processing capacity, thereby further restricting the supply of beef.

### B.     The Available Data Corroborates Witness 1's Account

118.   Public reports and data confirm that Defendants reduced and rationed their slaughter volumes during the time relevant to Plaintiffs' claims, resulting in supracompetitive beef prices sold to Plaintiffs and others.  Defendants also managed their respective slaughter volumes during the time relevant to Plaintiffs' claims in relative lockstep to ensure the supply of beef remained lower than the corresponding, increasing demand.  Defendants did so despite record margins being earned.

119.   The slaughter reductions took place at various points during the time relevant to Plaintiffs' claims.  Defendants collectively moderated their slaughter volume during the second and third quarters of most years in a successful effort to expand their margins.

120.   Defendants' joint slaughter management was not a reaction to changes in beef demand, which, as admitted by Tyson Fresh's head of procurement in 2018, had been "off the charts."[11]

---

[11]     Tyson Fresh Meats: What the Consumer Demands - John Gerber, VP, Cattle Procurement, Tyson Foods; Kevin Hueser, VP, Beef Pricing, Tyson Foods, from the 2018 NIAA Antibiotic Symposium: New Science & Technology Tools for Antibiotic Stewardship, November 13-15, 2018, Overland Park, KS, USA, https://www.youtube.com/watch?v=qCip3WBcqzo.

121.   Nor did any Defendant defect from the agreement and buy more cattle to capture greater market share, despite all Defendants posting profit margins demonstrating that no Defendant was running at or near their marginal cost of production.  Indeed, from the end of the first quarter of 2015 through the end of the time relevant to Plaintiffs' claims, Defendants posted record per head net margins.  Moreover, market events and conditions do not explain Defendants' unusually high profit margins – even excluding 2019 and 2020, which saw Defendants' margins increase in the aftermath of the Tyson Holcomb, Kansas plant fire and COVID disruption (discussed below).  Defendants' average per head margins during the time relevant to Plaintiffs' claims vastly exceeded their averages before approximately 2015.

122.   Tyson Fresh, Swift/Packerland, and National Beef each reduced their slaughter volumes during 2015, while Cargill held its slaughter volumes relatively steady following its 2014 cuts.  These artificial reductions occurred at approximately the same time as the collusive decline in fed cattle prices starting in 2015 and during the time relevant to Plaintiffs' claims, while beef prices were relatively stabilized or increased.

123.   While the quarterly reporting period obscures certain shorter reductions described below, it confirms the extent to which Defendants' quarter-to-quarter slaughter volume changes moved in lockstep with each other.  This parallelism is

consistent with, and the product of, Defendants' anticompetitive agreement to jointly manage and reduce their slaughter levels below a competitive level.

124.   The nature of Defendants' slaughter reductions in 2015 and 2016 is startling compared with historic production (2012-2014).   In 2015, the production decreased in the year overall and each quarter.   For 2016, the production decreased overall and for three of the four quarters.   Tyson Fresh, Swift/Packerland, CMS, and National Beef's production was down comparing year-on-year changes against an average of 2012-2014.

125.   Defendants' strategy was successful, with lower slaughter volumes and lower beef output resulting in artificially high beef prices, despite cattle prices falling.   Defendants' meat margin expanded as a result.

126.   Each Defendant's conduct stands apart from independent packers, who increased their annual slaughter volume in 2015 by 7.8% year-on-year.

127.   Defendants slaughtered fewer cattle during the time relevant to Plaintiffs' claims than they did before that period.   Although Defendants gradually increased their slaughter volumes year over year during the time relevant to Plaintiffs' claims, their rates of increase lagged far behind the rates of other producers' rates, and far behind the rate of change that would have occurred in a

competitive market.[12]  Fully five years after the start of the conspiracy, none of the Defendants had returned to their pre-2015 slaughter levels despite record profitability while independent packers' slaughter volume increased nearly 50% against their pre-2015 average, and 25% against their 2015 levels.

1.    Defendants Slash Production in 2015

128.   As evidenced by publicly available data, the impact of Defendants' conspiracy was significant.  Each Defendant cut its annual cattle slaughter volumes during the period relevant to Plaintiffs' claims by an average of about 13 percent compared to 2007-2014.

129.   Data breaking out slaughter volumes for years relevant to Plaintiffs' claims highlights Defendants' reductions in 2015, while other beef producers maintained or increased their volumes that year.  For example, despite a slight uptick in the final quarter of 2015, Tyson Fresh's overall 2015 slaughter volume was down by 4 percent as compared with 2014.  Similarly, Swift/Packerland's volume was down by 17 percent and National Beef's volume was down by 6 percent.  CMS's 2015 production was flat compared to 2014, but still 11.3% below historical levels.

---

[12]    *See* Cattle Buyers Weekly, "Top 30 Beef Packers" Annual Reports, 2008-2019, 2018 Meat & Poultry Facts, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11 (National Beef acquired Iowa Premium in June 2019, adding 300,000 head to its annual fed cattle slaughter volume.  Absent that acquisition its 2019 slaughter volume was flat versus 2018.  At the same time, independent packers' collective slaughter volume rose by approximately 100,000 head (net of Iowa Premium acquisition)).

All this occurred during a sustained recovery in the broader economy, featuring steady U.S. population and growing beef demand.

130.   In the first quarter of 2015, Tyson Fresh's, Swift/Packerland's and National Beef's slaughter volumes were down by approximately -1.8%, -11.2%, and -8.6%, respectively from first quarter 2014.  CMS's quarterly slaughter volume was down against a 2012-2014 average and its first quarter 2015 slaughter volume, like that of its co-Defendants, decreased compared to its fourth quarter 2014 volume.

131.   These declines were reflected in Defendants' public reporting.  Tyson's May 4, 2015 10-Q noted that its "sales volume decreased [in the quarter ending March 28, 2015, year-on-year] due to a reduction in live cattle processed."[13] Jefferies Financial Group, Inc. ("Jefferies"), National Beef's then majority shareholder, noted in its May 8, 2015 10-Q that "fewer cattle were processed."[14]

132.   JBS S.A.'s earnings presentation for the first quarter of 2015 noted a 1.1% year-on-year decline in the "number of animals processed" by its JBS USA beef unit.[15]

---

[13]   Tyson   Foods   Inc.   10-Q,   May   4,   2015   at   37, https://d1lge852tjjqow.cloudfront.net/CIK-0000100493/593a568a-359d-470d-b48e-3a1fe35419f7.pdf.

[14]   Jefferies 10-Q, May 8, 2015 at 57, http://ir.jefferies.com/reports-filings/sec-filings/sec-filings-details/default.aspx?FilingId=10683755.

[15]   JBS   S.A.,   1Q   2015   Results,   May   13,   2015   at   15, https://sec.report/otc/financial-report/141980.   JBS   USA   Beef   segment   also

133.   Expanding on their respective cuts, each Defendant extended its joint slaughter reductions during the second quarter and into the third quarter of 2015. Across the second quarter, Tyson Fresh's, Swift/Packerland's and National Beef's year-on-year slaughter volume was down by approximately -5.4%, -12.8%, and -6.2%, respectively.  CMS continued to maintain its 2014 slaughter volume, posting an essentially flat year-on-year growth of 1.8% in the second quarter, and -12.7% against its 2012-2014 average second quarter production.

134.   Defendants' reductions were also reflected in Tyson Foods',[16] JBS S.A.'s,[17] and Jefferies' (National Beef's)[18] financial reporting.

---

encompasses JBS S.A.'s much smaller Australian and Canadian beef businesses and Australian sheep operations.  Presentation also noted a -1.1% decline in cattle processing (both fed and non-fed) across its U.S., Australian and Canadian beef businesses.  JBS USA's fed cattle to non-fed cattle slaughter ratio during the time relevant to Plaintiffs' claims was 80% fed, 20% non-fed.

[16]   Tyson's 10-Q for its quarter ending June 27, 2015 recorded year-on-year declines in sales in its beef segment revenue due to a "reduction in live cattle processed".  *See* Tyson Foods 10-Q filed August 3, 2015, at 38.  *See also* 10-K filed November 23, 2015, at 29 noting reduction in sales revenue in FY 2015 as against FY 2014 due to lower cattle processing.

[17]   JBS S.A., 2Q 2015 Results, August 13, 2015 at 15, https://mz-filemanager.s3.amazonaws.com/043a77e1-0127-4502-bc5b-21427b991b22/central-de-resultadoscentral-de-downloads/02fd1b6f7f1cee632e5af617767bc7a98017ead954465d63d1e8633b2ec5a3cd/2q15_earnings_release.pdf (noting -0.9% decline in cattle processing (both fed and non- fed) across its US, Australian and Canadian beef businesses).

[18]   Jefferies   10-Q,   August   5,   2015   at   52, http://d18rn0p25nwr6d.cloudfront.net/CIK-0000096223/6f776d2a-f247-4868-a18b-32f9e3b4eefe.html (noting revenues for three and six month 2015 periods

135.   During the remainder of 2015, Defendants continued to restrain their slaughter levels and curtail their purchases of cash cattle even after it became clear that there was an abundant supply of slaughter-ready cattle available to purchase at historically low prices, and processed beef prices remained high.[19]  They did so even though it meant under-utilizing their plants, which is inconsistent with individual profitability but has the benefit of higher overall industry profitability.

136.   Tyson's CEO admitted that plants were not running at full capacity on August 3, 2015, when discussing Tyson's decreased purchases over the preceding quarter, noting: "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs.  In the short-term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term."   In response to a question regarding the impact of Tyson's underutilized plant capacity, Tyson's CEO elaborated: "In terms of quantifying the impact, ... we know when we're running 34s and 36s a week in our plants that does cost us in – it raises the cost in our plant, makes us a lot less efficient, so it does have

---

decreased year-on-year "due primarily to lower sales volume, as fewer cattle were processed"); Jefferies 10-Q, November 5, 2015 at 53 (noting the same in relation to 3Q 2015 and first three quarters of 2015).

[19]     Cassandra Fish, Kills Too Small For Too Long, THE BEEF (Sep. 8, 2015), https://www.thebeefread.com/2015/09/08/kills-too-small-for-too-long/.

a cost to us.  I don't know that I can quantify that right off the bat, but it does impact margin."

2.    Defendants Continued to Artificially Limit Supply in 2016

137.   By collusively "ration[ing] their new purchases [of cattle]" and running shorter 32-hour weeks in early January 2016, Defendants dampened rising cattle prices and extended the rally in beef prices.[20]

138.   Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their slaughter volumes in the first quarter of 2016: Tyson Fresh (-1.1%), CMS (-3.7%), Swift/Packerland (-16.6%), National Beef (-4.7%).   Moreover, all Defendants slaughtered fewer cattle than their average first quarter volume compared to 2012-2014: Tyson Fresh (-4.5%), Swift/Packerland (-5.3%), CMS (-9.3%), and National Beef (-14.8%).

139.   Beef prices continued to increase into March 2016, despite continuing depressed cattle prices.  By collusively reducing their slaughter volume, Defendants were able to post average weekly margins of approximately $63 per head, which was, at that time, one of their "best Q1 in history" and well above their pre-Relevant Period first quarter average of $0 per head.[21]

---

[20]    Cassandra Fish, Global Sell-Off Smacks Cattle, THE BEEF (Jan. 4, 2016), https://www.thebeefread.com/2016/01/04/global-sell-off-smacks-cattle/.

[21]    Cassandra Fish, Sell-Off Accelerates THE BEEF (Mar. 22, 2016), https://www.thebeefread.com/2016/03/22/sell-off-accelerates/.

140.   In the second and third quarters of 2016, each Defendant's kill volume remained below their 2012 to 2014 averages.

141.   Despite an increase in the availability of fed cattle, Defendants' 2016 slaughter volume remained below their 2014 levels (Tyson Fresh (-6%) and Swift/Packerland (-6%)) or flat (National Beef).[22]   Cargill's 2016 slaughter remained significantly below its 2012-2014 average at -3.7%.

142.   Each Defendant's refusal to break the collusive agreement among Defendants and co-conspirators is noteworthy given the margins Defendants realized across 2016.   In the third and fourth quarter alone, Defendants were realizing average per head margins on their fed cattle purchases of $123 and $153 per head, respectively.   Not only were these margins significantly above pre-2015 averages ($25 and -$16 per head, respectively), but they also exceeded Defendants' most profitable third and fourth quarters in recent history by about $30 and $100 per head, respectively.   Thus, it was against Defendants' unilateral self-interest not to buy and slaughter more cattle because each Defendant could have increased its profits by doing so.

---

[22]   2018 Meat & Poultry Facts, 47th Ed., NORTH AMERICAN MEAT INSTITUTE, 2019, at 11.

3.   <u>After Historic Cuts, Defendants Continued Restraining the Supply of Beef, Resulting in Higher Beef Prices in 2017 and 2018</u>

143.   During 2017, Defendants worked to ensure that any increase in their collective slaughter volumes did not outpace the growth in slaughter weight cattle availability or beef demand.  Tyson, Swift/Packerland, CMS, and National Beef each reduced their volumes in lockstep during the first quarter of 2017, before raising them together during the second quarter.  While cattle prices increased from $119/cwt at the beginning of February 2017 to a high of $144/cwt in the first week of May 2017 (like spring highs before 2015), Defendants responded by reducing their slaughter volumes.

144.   As with 2016, Defendants enjoyed substantial profits in 2017, posting substantial per-head margins in the second and third quarters ($128 and $147 per head, respectively).  Indeed, Defendants' average per head margins for the first and fourth quarter of 2017, $42 and $88 per head, respectively, stood second only to the quarterly profits they generated in 2016.  Once again, each Defendant refused to expand its market share despite the obvious profit potential.  Instead, they all kept their production in lockstep with one another and limited their purchases of cattle to ensure the continued suppression of cattle prices and a corresponding increase in beef prices.

145.   Defendants' scheme continued into 2018.   Defendants reduced their respective kill schedules during the first quarter of 2018 compared to 2017.[23]   As industry analyst Ms. Fish reported, "Looking back at March's fed slaughter rate, it underperformed expectations....   Packers appear to have responded to the tight supply of market-ready cattle in the north by keeping the kill constrained and margins profitable and stable."

146.   Defendants' slaughter reductions occurred despite record strong beef prices and Defendants' under-utilized capacity.

147.   As a result of their commitment to limiting their purchases of cattle, in 2017 and 2018, Tyson Fresh, Swift/Packerland, CMS, and National Beef's annual slaughter volumes remained 5.4-7.2%, 10.2%, 9.1% and 12.0-12.8% below their pre-2015 averages, respectively.   By sharp contrast, independent packers' slaughter volume in 2017 and 2018 increased 46.5% and 56.1%, respectively, as compared to their collective pre-2015 averages.

---

[23]   Cassandra Fish, Futures Trade Both Sides; Cash Poised To Trade Lower, THE BEEF (Apr. 2, 2018), https://www.thebeefread.com/2018/04/02/futures-trade-both-sides-cash-poised-to-trade-lower/.

4.      In 2019 and 2020, Defendants' Continued to Slaughter in Parallel, Against Their Independent Self-Interest

148.   Entering 2019, beef demand remained high, thus encouraging packers to run plants to meet customer's demand.[24]  In a competitive environment absent a conspiracy, Defendants would compete to secure as much cattle as possible to expand profitable production.

149.   Instead, Defendants continued to collude to limit slaughter volumes despite market conditions that encouraged market participants to increase, not decrease, slaughter volumes.  In the first quarter of 2019, each Defendant reduced its slaughter volume levels, posting significant quarter-on-quarter declines: Tyson Fresh (-3.5%), National Beef (-4.0%), CMS (-3.8%), and Swift/Packerland (-4.1%). Defendants maintained comparably lighter slaughter volumes across the first three months of 2019.  These supply restraints included taking downtime or reducing slaughtering plant hours.  Defendants continued to constrain their weekly kill volume and declined to increase production of beef to meet rising demand, thereby collusively and artificially inflating the price of beef.[25]

---

[24]     Cassandra Fish, How About That, THE BEEF (Feb. 11, 2019), https://www.thebeefread.com/2019/02/11/how-about-that-3/  ("Rather  obviously, beef demand is terrific.  Even in February, notoriously a slow beef demand month. Packer margins are record wide for February.").

[25]     *See, e.g.*, Cassandra Fish, And the Beat Goes On, THE BEEF (Feb. 14, 2019), https://www.thebeefread.com/2019/02/14/and-the-beat-goes-on-2/.

150.   Defendants' ongoing collusive slaughter volume restraint in 2019 caused beef prices to increase, even though prices for cattle continued to decline to an apparent bottom of about $109-110/cwt by the end of June 2019.  This allowed Defendants to achieve an estimated per head profit of $257.[26]

151.   Amidst robust beef demand, Defendants' restrained production resulted in higher beef prices on a year-on-year basis, even though fed cattle prices had declined.  Industry analyst Ms. Fish reported that beef prices were "sizzling" despite most cattle producers losing money.[27]

152.   A fire at Tyson's Holcomb, Kansas slaughter and processing plant on August 9, 2019, provided an opportunity for Defendants to further reduce the beef supply and reduce cattle prices.  Tyson closed the Holcomb plant indefinitely after the fire.[28]  Tyson's Holcomb plant processed about 6,000 head of cattle per day and

---

[26]   Sterling Beef Profit Tracker: week ending June 21, 2019, STERLING MARKETING INC. (June 26, 2019), https://www.drovers.com/news/industry/profit-tracker-feeding-losses-reach-triple-digits.

[27]   Cassandra Fish, Packers Press and Cash Softens, THE BEEF (August 9, 2019), https://www.thebeefread.com/2019/08/09/packers-press-and-cash-softens/.

[28]   Over 3,800 workers at Tyson Foods beef plant in Kansas out of work after fire, REUTERS (Aug. 11, 2019, 1:30 PM), https://www.reuters.com/article/us-tyson-foods-fire/over-3800-workers-at-tyson-foods-beef-plant-in-kansas-out-of-work-after-fire-idUSKCN1V10J1?source=content_type%3Areact%7Cfirst_level_url%3Anews%7Csection%3Amain_content%7Cbutton%3Abody_link.

was one of seven U.S. plants capable of processing that capacity.  Only Tyson's Dakota City, Nebraska, plant is larger, processing up to 7,000 head of cattle per day. The fire created a shortfall in the national packing capacity of approximately 30,000 heads per week, or approximately 6% of the total U.S. fed cattle packing capacity.

153.   However, following the plant fire, Tyson Fresh, Swift/Packerland, CMS, and National Beef reduced their fed cattle bids and hiked their beef prices. These actions caused a ~$5/cwt drop in fed cattle prices and a ~$14/cwt rise in wholesale beef prices the following trading week.[29]  Defendants' per head margins nearly doubled from $191 to $358 in the week ending August 16.  The following week, Defendants' margins continued to expand, with the spread between fed cattle prices and beef values extending to a then-record high of $67.17/cwt., $39.51/cwt above the average spread for the same week across 2016-2018.

154.   Tyson Fresh, Swift/Packerland, CMS, and National Beef reaped record high margins in the weeks following the Holcomb fire with reduced fed cattle prices and increased beef prices.  As cattle prices bottomed out in the week ending September 13, 2019, the spread between Defendants' and cattle producers' per head

---

[29]     Sterling Beef Profit Tracker: week ending August 16, 2019, STERLING MARKETING INC. (August 20, 2019), https://cdn.farmjournal.com/s3fs-public/inline-files/Beef%20Tracker% 2081919.pdf.  Live cattle futures contracts were also negatively impacted, with the market responding with two limit-down trading days on September 12 and 13, 2019.

margin exceeded $600, with packers making over $400 per head while cattle producers sustained $200 per head losses.[30]

### C.   Defendants Idled and Closed Plants, and Refrained From Expanding Processing Capacity

155.   Another anticompetitive means by which Defendants and co-conspirators implemented their conspiracy involved a longer-term strategy to restrict beef supplies.   Defendants permanently closed processing facilities without replacing most of the lost capacity.   These include, for example:

- On September 11, 2015, Cargill announced it would sell the Plainview, Texas, plant that it idled in February 2013 because it did not "make sense to reopen [the plant], especially with excess processing capacity remaining in the region."[31]

- In August 2015, Tyson Food decreased the industry's slaughter capacity by another 2,000 cattle per day by shuttering its Denison, Iowa plant.

156.   By idling plants, Defendants slashed the industry's annual slaughter capacity by some two million cattle per year.

157.   While overall industry slaughter capacity increased slightly from 2015 to 2018, this nominal gain was primarily attributable to other, non-conspiratorial beef-processing companies.   For example, One World Beef Packing restored about

---

[30]   https://www.drovers.com/markets/profit-tracker/packer/feeder-margin-spread-now-exceeds-600-head.

[31]   *Available at*  https://www.meatpoultry.com/articles/13418-cargill-to-sell-texas-plant.

2,000 cattle per day by reopening the Brawley, California plant closed by National Beef in 2016.

158.   In sharp contrast to Defendants' behavior, non-conspiratorial beef processing companies acted consistent with their competitive interests by increasing their capacity and output in response to reduced costs of cattle and increased prices for beef.  However, their efforts to supply the market with beef had little effect on the prices due to their small market share.  Defendants' market dominance and stranglehold on the industry meant that these output expansions by the few remaining independent processors increased availability only in isolated instances and places and had negligible effects on restoring supply (and thereby reducing beef prices) in most locations.[32]

### D.   Defendants' Parallel Reductions in Cash Cattle Purchases and Anticompetitive Queuing Conventions

159.   Defendants procure their fed cattle in three ways: (1) on the cash cattle trade market (the industry's version of the spot market); (2) through formula or

---

[32]      JBS was the only Defendant that made any capital investment to increase industry slaughter capacity during the time relevant to Plaintiffs' claims. JBS expanded its Hyrum, Utah plant in 2015 and 2016.  However, according to JBS's press releases and several industry publications, the purpose of this expansion was to increase its capacity to process culled dairy cows and not fed cattle.  Unlike fed cattle, culled cows are not used for beef – the product at issue in this lawsuit – but rather are used for ground beef.

forward contracts; and – for Swift/Packerland and CMS – (3) by relying on their own cattle.

160.   To increase their meat margin, Defendants jointly managed their purchases of domestic cash cattle in parallel below the available supply, including by reducing the number and volume of purchases.  Defendants took advantage of the supply glut to non-Defendant purchasers to lower cash cattle prices and increase their meat margin.  Defendants expanded their meat margin by refusing to pass-on the savings from the reduced cattle prices to their customers, including Plaintiffs, which would normally happen in a competitive market.  Instead, beef prices remained high while prices to cattle producers decreased, indicating a collusive agreement among Defendants.

161.   In addition to Defendants' reduced cash cattle purchases, each employed an antiquated "queuing convention" during the time relevant to Plaintiffs' claims which served to limit cattle producers' ability to generate price competition for their cattle.

162.   This convention, which operated predominantly in relation to those cattle sold in the cash market, work as follows: Once a cattle producer receives a bid from a meat packer, such as Defendants, the producer may either accept the bid or pass on it, but may not "shop" that bid to other packers, *i.e.*, require competition for the bidding process.  If another meat packer offers the same bid as the original

bidding meat packer, then the cattle producer must give the original meat packer the right of first refusal.

163.    The obligation to give a right of first refusal without consideration was collectively imposed by Defendants under the threat of boycott.  Defendants have adhered to and enforced the convention for decades, including during the time relevant to Plaintiffs' claims, and treat it as a mandatory industry custom.

164.    On information and belief, one former feedlot manager, Matt T. ("Witness 2"), has confirmed that the field buyers from Tyson Fresh (Brian Alsup), Swift (Levi Canales, and prior to him, Chad Miller), CMS (Rick Vogel, and prior to him, Steve Brown), and National Beef (Richard Duffy) who visited his feedlot enforced strict adherence to this convention with threats of retaliation.  In particular, each of these field buyers individually spoke to him about the importance of his feedlot complying with the convention, and that they would not "come by" anymore should he break with it.

165.    Witness 2 further reports that, when he took over management of the feedlot in 2012, the feedlot would only receive bids from National Beef and CMS. When he subsequently spoke to the buyers from Tyson Fresh (Mr. Alsup) and Swift (Mr. Miller) responsible for his region in the fall of 2012, they both told him that they had stopped visiting the feedlot because Witness 2's predecessor had broken with the convention by "shopping" their bids.  Witness 2 reports that the Tyson Fresh

and Swift field buyers re-commenced visiting the feedlot after he confirmed his commitment to following the convention.

166.   Witness 2 also heard from Defendants' field buyers and other industry participants about other cattle producers being "blackballed" for breaking with the queuing convention.   In those circumstances, Witness 2 understood that the Defendant who was "on the cattle" would be tipped off as to the producer's "breach" of the convention by the field buyer contacted while shopping the Defendant's bid, or would ex-post pressure the producer for details of its sale.

167.   As evidenced by the expanding meat margin, Defendants collectively manipulated the entire market, keeping the ill-gotten gains for themselves.

## VI.   ADDITIONAL PLUS FACTORS ENCOURAGING THE REASONABLE INFERENCE OF DEFENDANTS' CONSPIRACY

168.   The beef meatpacking industry contains several characteristics, which individually or one or more in combination, make it conducive to cartelization.   This plausibly supports the inference that the alleged conspiracy existed.   These characteristics, or "plus factors," include: (i) the ability to signal through public communications; (ii) high producer concentration; (iii) high barriers to entry; (iv) commodity products; (v) inelastic demand; and/or (vi) opportunities to collude. Each of the beef industry plus factors was present in 2015 (if not earlier) and throughout the time relevant to Plaintiffs' claims.

A.   **Defendants Signaled Their Conspiracy and Encouraged Each Other to Maintain It**

169.   One method that Defendants used to coordinate, promote, and monitor their conspiracy was to signal their activities and plans during earnings calls. Examples of such communications include the following:

- During a May 2014 earnings call, JBS S.A. offered this industry forecast: "For 2015, I think beef will keep [being] tight. I don't see any big – an increase in beef supply in 2015[.]"

- During a May 2014 Q4 earnings call, Tyson Foods communicated that it was striving for margin and not market share: "For FY15, we expect fed cattle supply to be down 5% to 6% from last year, and we think we've experienced the bottom of the beef supply cycle. After this year, we believe we'll see slow incremental improvement in supply. Our beef segment results should improve in the back half of the year, and while profitable for the year, FY15 results are expected to be below FY14. It is important to remember that we'll continue to run our beef business for margin, not market share."

- During Tyson Food's Q4 2015 earnings call, its CEO further acknowledged that "[You've got] relatively low cattle supply, you've got too much -- well, I should not say too much, that's probably not the right way to say it -- but you've got excess industry capacity and that limits our ability to drive margins above the 1.5% to 3%, we think."

- On Tyson Foods's August 3, 2015, Q3 earnings call, its CEO admitted that it was underutilizing its plants, despite hurting its margins. He discussed Tyson's decreased purchases over the preceding quarter, and noted "[b]ecause we run for margin and not for market share, we're not willing to overpay for cattle and we've had to cut back on our hours at our plants resulting in inefficiencies and added costs. In the short term, we are negatively impacted, but markets will equilibrate and conditions are expected to improve for the long term." He also admitted that "industry capacity utilization, [was] probably in the low 70s"

in line with Tyson.  In response to a question regarding the impact of Tyson underutilizing its plant capacity, Tyson's CEO elaborated: "In terms of quantifying the impact, we know when we're running 34s and 36s a week in our plants that that does cost us.  It raises the cost in our plant, makes us a lot less efficient, so it does have a cost to us.  I don't know that I can quantify that right off the bat, but it does impact margin."

- On its November 12, 2015, Q3 earnings call, JBS USA's CEO publicly praised Defendants' efforts to reduce industrywide slaughter capacity through plant closures, remarking that "the reduction that we saw in the cutbacks of production in U.S. ... that was with the shutdown of nine plants the last two years reduced the cattle.  (inaudible) cost us [$3.5 million].  I think that will be a very good position balancing the industry in 2016, 2017 and 2018."

- On a May 2016 JBS S.A. Q1 earnings call, JBS USA's CEO described the company's supply strategy: "So I don't see any imbalance in the near future, even cattle -- is coming back and we're going to see a little bit more production of beef this year and next year, it's still way, way below how it was few years ago.  And we will be balancing at this side because a lot of plants was shut, but it's still way below our historical production level."

- On its November 2016, Q4 earnings call, Tyson Foods acknowledged the widening of the meat margin: "The dynamic is that the livestock prices, they've come down faster than the retail prices have, which has allowed us to make the margins that we have right now in [] beef…."

## B.  <u>The Beef Market is Highly Concentrated</u>

170.  Market concentration facilitates collusion.  Conspiracies are easier to organize and sustain when only a few firms control a large share of the market. Practical matters, such as coordinating cartel meetings, exchanging information, and monitoring compliance are simpler with a small number of players.

171.   In this case, high market concentration coupled with Defendants' substantial collective market share in the beef market simplifies coordination, because little outside competitive presence exists to undermine the cartel, and Defendants can more easily monitor each other's actions related to supply and pricing.

172.   The beef industry experienced significant consolidation leading up to and during the time relevant to Plaintiffs' claims.  In 2001, Tyson Foods purchased IBP, Inc., then the nation's largest beef packer.  In 2002, Cargill purchased Taylor Packing Co.  In 2007 and 2008, JBS USA acquired Swift & Co. and Smithfield Beef Group, Inc. (renamed JBS Packerland, Inc. after the acquisition), the third- and fifth-largest U.S. beef packers.  JBS S.A. also sought to acquire National Beef, but decided to end the acquisition after a challenge by the United States Department of Justice.  The DOJ publicly stated that the takeover would result in lower prices paid to cattle suppliers and higher beef prices for consumers at a time when the beef industry had become increasingly consolidated, with a handful of companies accounting for most of the nation's beef production.

173.   Through these purchases, Defendants collectively controlled about 81-85 percent of the beef market during the time relevant to Plaintiffs' claims, while the next largest meatpacker had only a 2-3 percent market share.  Defendants'

control of the market enabled them to launch their conspiracy no later than 2015 and prosper ever since.

### C.   **The Beef Market Has High Barriers to Entry**

174.   Barriers to entry are obstacles that prevent new competitors from easily entering a market.  They restrict competition in a market and make it easier for incumbents to collude.

175.   A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from supracompetitive prices.  However, when significant barriers to entry exist, new entrants are less likely to enter the market.  Thus, barriers to entry help facilitate the formation and maintenance of a cartel.

176.   Barriers to entry kept would-be competitors out of the beef-packing industry.  The construction of a large packing plant requires an investment of approximately $300 million.  For example, in the Summer of 2021, Cattlemen's Heritage announced that it planned to build a meatpacking plant at a cost of approximately $325 million.  It normally takes about two years to plan and build the facility, and the investment is not easily reversible or convertible to other uses.  Moreover, new entrants must also comply with numerous regulations, recruit and train a large workforce, and develop and execute a successful marketing plan.

Relative insulation from the threat of new competitors has enabled Defendants to maintain their conspiracy.

**D.**   **Beef is a Commodity Product**

177.   A commodity product is a basic item or good used in commerce that is interchangeable with other goods of the same type.

178.   Markets for commodity products are susceptible to collusion.  Demand for a commodity depends primarily on price, as opposed to other attributes such as product quality or customer service.  As a result, cartel members can more easily monitor compliance and detect defectors.

179.   Price discrepancies for commodity products are more likely to expose defection from a conspiracy because qualitative factors such as special product features, quality, reliability, durability, and other terms of a transaction are unlikely to explain price discrepancies.

180.   Beef is a commodity product.  The USDA grades beef.  For example, prime beef roasts from Tyson and Cargill are virtually indistinguishable and have nearly identical nutritional content.  The USDA recognizes beef as a commodity and posts daily beef prices.  Options and futures for the cattle from which beef is produced are traded as commodities on the Chicago Mercantile Exchange.

E.     **The Demand for Beef is Inelastic**

181.   Price elasticity describes the sensitivity of suppliers or consumers to changes in the price of a good or service.  Demand is inelastic if an increase in the price of a product results in only a small decline in the demand for that product.

182.   A cartel profits from raising prices above competitive levels when demand is relatively inelastic at competitive prices.  An increase in price for a product with inelastic demand increases the seller's revenue, while the reduction in output lowers costs.  For a product with elastic demand, increased prices would result in declining revenues, as customers purchase substitute products or decline to buy altogether.

183.   Inelastic demand is a market characteristic that facilitates anticompetitive conspiracies because it allows producers to raise their prices without lowering sales volume or triggering customer substitution to alternatives.  Thus, from the standpoint of conspiring producers, inelastic demand facilitates the profitability of a supply-reducing conspiracy.

184.   Beef demand is relatively insensitive to price changes.  According to a recent study of beef demand, "[s]ince beef has an inelastic demand, industry total

revenue increases when prices rise as there comparatively is a limited reduction in volume purchased."[33]

185.   The same study concluded that the relative impact of pork and chicken prices on beef demand is economically small.  Thus, Defendants' supracompetitive beef prices to its direct purchasers do not significantly reduce beef sales or lead purchasers to seek protein from other meat sources.

### F.   Defendants Had Multiple Opportunities to Collude

186.   Defendants are members of industry trade associations and forums and regularly attend industry events, including the events listed below.  There is nothing unlawful about a firm participating in a trade association or attending trade association meetings.  However, if rivals are together at trade association meetings and exchange competitively-sensitive information or agree on the production, pricing or sale of a good or service, then the antitrust laws are implicated.  Further because trade groups necessarily bring together competitors ostensibly for purposes of trade association activities, such trade groups and their activities provide cover for competitors to collude with seeming impunity.  As noted earlier, discovery will be necessary to determine the full extent of Defendants' communications at or through trade association activities in furtherance of the conspiracy.  However, as

---

[33]   Glynn Tonsor, Jason Lusk, Ted Schroeder, Assessing Beef Demand Determinants, (Jan. 18, 2018) at 7-9, https://www.beefboard.org/wp-content/uploads/2019/06/Assessing-Beef-Demand-Determinants_FullReport.pdf.

demonstrated below, Defendants had multiple opportunities to collude at various trade association meetings.

187.   For example, the National Cattlemen's Beef Association ("NCBA") holds an annual convention, CattleCon during which various meetings take place.[34] The NCBA Product Council, which includes Defendants' representatives and representatives from other packers, meets quarterly for the invitation-only Beef Executive Forum.   Two of Defendants' executives, former CMS/Cargill Vice President of Cattle Procurement and former Tyson SVP of Beef Margin Management and VP of Boxed Beef Pricing, were officers, board members, or formally designated participants of the NCBA during the time relevant to Plaintiffs' claims.   Defendants also participate in Beef Checkoff program meetings.   The Beef Checkoff program is run by the Federation of State Beef Councils and the programs meetings are held contemporaneously with the NCBA summer and winter meetings.

188.   The U.S. Meat Export Federation ("USMEF") is another example of a trade association at which Defendants regularly met during the time relevant to Plaintiffs' claims.   The USMEF develops export opportunities for U.S. protein producers and holds both spring and fall conferences and monthly international trade

---

[34]     NCBA Allied Industry Membership, NAT'L CATTLEMEN'S BEEF ASS'N (2019), https://convention.ncba.org/.

shows.[35]  USMEF leadership includes current and former employees and officers of Defendants.  For example, former CMS/Cargill Vice President of International Sales was an officer, board member, or formally designated participant of the USMEF; former Tyson Foods SVP of International Sales served as the Chair, Vice Chair, and on the Executive Committee of the USMEF; former Tyson Foods SVP of International Sales and VP International Sales was a formal participant of the USMEF; National Beef International President and former Vice President of International Sales served on the Export Committee of the USMEF; and former National Beef NBP International Sales President served on the Export Committee of the USMEF.  In November 2017, Tyson's SVP of International Sales and CMS's VP of International Sales both attended the USMEF Strategic Planning Conference in Tucson, Arizona.[36]

189.   Defendants were among the founding members of the Global and U.S. Roundtables for Sustainable Beef, and they remain members.   Defendants

---

[35]    Events: Meetings, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/ events/bod-meetings/; Events: Trade Show Calendar, U.S. MEAT EXP. FED'N (2019), http://www.usmef.org/events/trade-shows/. Defendants know the identity of each person identified by title throughout this and later sections of the Complaint, and thus we decline to name them here.

[36]    USMEF Members Examine Challenges ahead, Elect New Officer Team, U.S. MEAT EXP. FED'N (Nov. 3, 2017), https://www.usmef.org/news-statistics/member-news-archive/usmef-members-examine-challenges-ahead-elect-new-officer-team/.

participate in its annual meetings each spring, and JBS and Cargill have leadership positions in some of the working groups.

190.   Defendants also met for multiple meetings, conferences, conventions, and expositions sponsored by the North American Meat Institute ("NAMI") and its predecessor, the American Meat Institute.  NAMI is a national trade association that represents companies that process 95% of red meat.[37]  Executives and employees of Defendants also participated and held leadership positions in the NAMI.  For example, CMS President of Business Operations & Supply Chain and former Cargill Beef President was an officer, board member, or formally designated participant of the NAMI; former Tyson Foods CEO, Group President of Fresh Meats & International, and COO served on the Executive Committee of the NAMI; former Tyson Foods CEO and President also served on the Executive Committee of the NAMI; National Beef President and CEO served on the Executive Committee of the NAMI; and JBS USA CEO served on the Board of Directors of the NAMI.

191.   The NAMI and the Food Industry Association host an annual Meat Conference, attended by various executives and employees of Defendants every

---

[37]   *See* About NAMI, NAT'L AM. MEAT ASS'N (2019), https://www.meatinstitute.org/ index.php?ht=d/sp/i/204/pid/204; Events, NAT'L AMERICAN MEAT ASS'N (2019), https://www.meatinstitute.org/ index.php?ht=d/sp/i/10422/pid/10422.

year.[38]  In 2017, National Beef's President and CEO, Tyson's Vice President of Boxed Beef Pricing, JBS USA's CEO, and CMS Vice President of Sales, among other Defendant executives, were listed as attendees of the Meat Conference.[39]  In 2018, these executives from National Beef, Tyson and JBS USA, and Cargill Vice President of Retail Beef Business attended the Meat Conference.[40]  In 2019, these executives from JBS USA, Tyson, National Beef, and Cargill were listed as attendees.[41]  In 2020, these executive from Tyson and National Beef again signed up to attend the Meat Conference along with various other Cargill and JBS executives and employees.[42]

192.  Until April 2017, NAMI sponsored an annual Meat Industry Management Conference, which offered topics such as economics and general

---

[38]     Meat Conference, NORTH AM. MEAT INST. AND FOOD INDUS. ASS'N, http://meatconference.com/ (last visited May 23, 2022).

[39]     2017 Annual Meat Conference: Registered Attendees, FOOD INDUS. ASS'N (Last visited May 23, 2022) https://www.fmi.org/forms/meeting/ MeetingRosterPublic/viewRoster?meetingId=43A35D00000DFE&sortBy=name.

[40]     2018 Annual Meat Conference Attendee List as of 2.9.2018, MEAT CONFERENCE (Feb. 9, 2018), http://meatconference.com/sites/default/files/ books/2018%20Annual% 20Meat%20Conference%20Attendee%20List.pdf.

[41]     Meat Conference 2019 Attendee List (as of 2/27), MEAT CONFERENCE (Feb. 27, 2019), http://meatconference.com/sites/default/files/ books/2019-AMC-Attendee-List.pdf.

[42]     2020 Annual Meat Conference: Registered Attendees, FOOD INDUS. ASS'N (Dec. 9, 2020), https://www.fmi.org/forms/meeting/MeetingRosterPublic/ viewRoster?meetingId=571D81000004FF&includeUnpaid=1&sortBy=title.

business.  That conference was then replaced by an annual Meat Industry Summit. This summit has sponsored "networking opportunities and social events" including a golf tournament, receptions, an "Issues, Answers, Actions Breakfast," the annual NAMI board meeting, and what one publication described as "closed door committee meetings to discuss policies and association business."  The 2017 summit included a presentation by John Nalivka of Sterling Marketing entitled "Economic Outlook for the Red Meat Industry," described as an "analysis of supply and demand and price forecasts" to "cover all aspects of the supply chain, and help your business prepare for the years ahead."

193.   The beef industry's Annual Meat Conference – described on the event's website as "a complete education and networking experience" – provided another opportunity for Defendants to collude.  Many of Defendants' high-level executives have been attending this conference for years.  The list of registered attendees in 2012, for example, included various executives from JBS, Tyson Foods' then-CEO, and twelve other Tyson executives.

194.   Defendants' executives and employees also attended "AgCon," a joint conference from the Commodity Futures Trading Commission and the Center for

Risk Management Education and Research at Kansas State University, in 2018.[43]

CMS's and Tyson's executives were listed as attendees of the 2018 AgCon, along

with other Defendants' executives and employees, including Tyson Fresh's VP of

Sourcing & Risk Management; Tyson Fresh's VP of Cattle Procurement; National

Beef Vice President of Cattle Procurement; National Beef Vice President of

Procurement and Risk Management; and JBS USA's Head of Risk Management.[44]

195.   Executives from Tyson, JBS, and Cargill also had ample opportunities

to meet privately, particularly at the beginning of the conspiracy, as a result of JBS's

acquisition of Tyson and Cargill's Mexican and Brazilian chicken and U.S. pork

operations, respectively.   JBS S.A.'s purchase of Tyson's Brazilian and Mexican

chicken operations was announced on July 28, 2014, and closed on December 1,

2014 and June 29, 2015, respectively,[45] while its purchase of Cargill's U.S. pork

operations was announced on July 1, 2015 and closed on October 30, 2015.  Cargill,

Tyson, and JBS executives with responsibilities relating to beef and cattle, such as

---

[43]   Inaugural AgCon brings business, government together to discuss ag futures markets, KANSAS STATE UNIV. (Mar. 8, 2018), https://www.ksre.k-state.edu/ news/stories/2018/03/AgCon2018.html.

[44]   2018 AgCon Attendees, KANSAS STATE UNIV. (Mar. 28, 2018), https://www.k-state.edu/riskmanagement/documents/Ag_Con_2018_Attendees_Mar30.pdf.

[45]   JBS Foods Int'l B.V., Registration Statement (Form F-1) at 112 (Dec. 5, 2016), https://www.sec.gov/Archives/edgar/data/1691004/000119312516785274/d304020df1.htm.

the then-Tyson CEO and President,[46] JBS USA CEO,[47] and then-Cargill Senior Vice President,[48] were all involved in the acquisition discussions. JBS S.A.'s CEO stated in July 2015 that its "courtship" with Cargill in relation to its U.S. pork operations "started years ago," with discussions intensifying at the beginning of 2015.[49]

196.    These events afforded Defendants' top executives and other employees frequent opportunities to discuss pricing, production, and other proprietary information in furtherance of the conspiracy in an informal setting and monitor compliance with their conspiracy.

---

[46]    Tyson to sell Mexico, Brazil poultry businesses to JBS, REUTERS (July 29, 2014, 1:32 PM), https://www.reuters.com/article/us-tyson-foods-results/tyson-to-sell-mexico-brazil-poultry-businesses-to-jbs-idUKKBN0FX0UR20140729.

[47]    Lawrence Aylward, Inside the JBS, Cargill deal, MEAT + POULTRY (July 2, 2015), https://www.meatpoultry.com/articles/13164-inside-the-jbs-cargill-deal.

[48]    Press Release, Cargill, JBS USA Pork agrees to purchase Cargill Pork business (July 1, 2015), https://www.cargill.com/news/releases/2015/NA31861255.jsp.

[49]    Luciana Magalhaes, With Cargill Purchase, Brazil's JBS Poised to Become No. 2 Pork Producer in U.S., WALL STREET JOURNAL (July 2, 2015, 3:18 PM), https://www.wsj.com/articles/with-cargill-purchase-brazils-jbs-poised-to-become-no-2-pork-producer-in-u-s-1435864508.

### G.    Defendants' Market Share Stability is Indicative of a Conspiracy

197.   In a competitive market, market shares typically fluctuate as producers compete for and gain business from each other.  Relatively stable market shares over time is a "plus factor" plausibly supporting the alleged conspiracy.

198.   Although relative market-share stability in a commodity market does not itself prove collusion, it suggests operation of an effective cartel that has agreed not to compete.  A marked decline in market-share volatility over time may suggest a conspiracy in a previously competitive market.

199.   On information and belief, Defendants' relative market shares, measured by wholesale beef sales, became more stable after 2014 and during the time relevant to Plaintiffs' claims.  The same is true for Defendants' market shares as measured by slaughter capacity.

200.   Defendants did not attempt to capture each other's market share by offering lower prices as their costs declined, as would be expected in a competitive market.

## VII.   THE BEEF INDUSTRY FACES GOVERNMENTAL INQUIRIES AND INVESTIGATIONS

201.   In August 2019, the USDA opened an investigation into the beef industry following the fire at Tyson's Holcomb, Kansas plant.  The USDA took notice after the reduction in available supply simultaneously caused cattle prices to fall while elevating beef prices.

202.   On March 19, 2020, U.S. Senators Mike Rounds of South Dakota, Kevin Cramer and John Hoeven of North Dakota, and Steve Daines of Montana sent a letter to the DOJ urging the department to launch an investigation into price-fixing in the cattle market.   The Senators highlighted Defendants' harm to upstream producers and downstream consumers.

203.   On a conference call reported in the press, Senator Rounds stated the request was for the DOJ "to definitively answer whether a packer oligarchy exists within the cattle market and inherently creates an anticompetitive marketplace that unfairly disadvantages the cattle producer and the consumer."   Senator Rounds further commented: "These margins just don't make any sense.   The reality is there is an inverse correlation between the producer's price and the consumer's price."

204.   On April 8, 2020, Reuters reported that the USDA had extended its investigation to include the observed pricing dynamic in which Defendants paid reduced prices to ranchers for cattle coupled with surging retail beef prices.   The USDA extended its investigation in the wake of announced production shortages associated with the COVID-19 outbreak.

205.   On April 17, 2020, state-level cattle production trade associations from 23 states signed a letter to then-Attorney General William Barr requesting that the DOJ coordinate with the USDA and launch its own investigation into "fraudulent

business practices within the meatpacking industry."   Signatories included the Minnesota State Cattlemen's Association.

206.   The letter described the two extraordinary pricing episodes, identified by the USDA, following the Holcomb fire and during the COVID-19 outbreak.  The state trade associations not only reported their own situation but also observed that: "The nature of previous and current concern in both situations is extreme market degradation to the producer segment quickly followed by sharp increases and unseasonable profitability to the packing segment through boxed beef prices."

207.   With respect to the most recent manipulations, the letter explained that: "We are now seeing that same type of price action [observed after the Holcomb fire] repeated – only in a more extreme manner and during a time of crisis that includes logistical stressors on the nation's food production and distribution system."

208.   On May 5, 2020, 11 state attorneys general, including the Montana attorney general, signed a joint letter to then-Attorney General Barr urging the DOJ to open a coordinated federal antitrust investigation into "anticompetitive practices by the meat packers in the cattle industry."  This letter noted that: "Cattle ranchers ... often struggle to survive.  Consumers, moreover, do not realize the benefits from a competitive market."

209.   On June 4, 2020, Bloomberg reported that the DOJ had served civil investigative demands on Tyson Foods, JBS S.A., Cargill, and National Beef in

connection with an investigation into antitrust violations consistent with the earlier requests by the producer trade associations and state attorneys general.

210.   In a letter dated May 17, 2021, sixteen members of the Senate and Congress, including Senator Steve Daines of Montana and Congressman Matthew Rosendale, Sr. of Montana, urged Attorney General Merrick Garland to continue the DOJ investigation into the nation's four biggest meatpackers and provide Congress with updates.   The letter also noted that the fire at the Tyson Holcomb, Kansas facility "created significant market disruptions."

## VIII.  DEFENDANTS FRAUDULENTLY CONCEALED THEIR CONSPIRACY

211.   Defendants took affirmative actions to fraudulently conceal their conspiracy from Plaintiffs through at least the filing of the first related complaint.

212.   Defendants used various means and methods to fraudulently conceal their conspiracy from Plaintiffs, including, but not limited to, secret meetings, surreptitious communications between Defendants by telephone or in person meetings to prevent the existence of written records, statements to Plaintiffs designed to deceive Plaintiffs about the real factors involved in the prices that Plaintiffs paid for beef, and not disclosing their supply-restraint agreement in communications on documents.

213.   As set forth above, Defendants engaged in secret behaviors intended to further their conspiracy.   Defendants' conspiracy – based on behaviors known only

to Defendants to be unlawful at the time they performed them – plausibly suggest

that Defendants engaged in a fraudulent concealment campaign.

214.   Defendants concealed their illegal behavior from Plaintiffs by, among

other measures:

- communicating privately by telephone about their purchases and slaughter volumes, so to avoid creating a paper trail, as well as relying on nonpublic forms of communication;

- offering false or pretextual explanations for the low fed cattle prices;

- providing pretextual justifications for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade;

- explicitly and implicitly representing that the beef bids and contract terms offered to Plaintiffs were the product of honest competition and not a conspiracy;

- misrepresenting that Defendants complied with applicable laws and regulations, including antitrust laws; and

- misrepresenting the nature of Defendants' agreements (and purported adherence to competitive safeguards) to government officials and the public.

215.   Defendants also affirmatively misrepresented their compliance with

antitrust laws:

- Tyson's Code of Conduct represents that "[w]e compete in the market with integrity and comply with competition laws [and [w]e comply with the letter and spirit of competition laws (also referred to as "antitrust" laws) wherever we do business."

- JBS's 2014 Annual Report asserts that the company has clear policies "[t]o ensure ethical conduct and integrity in the management of its business," including a Manual of Ethical

Conduct "that addresses issues related to violations, conflicts of interest, third-party contracts, employment practices, receiving gifts, decision making, anti-corruption practices, and other sensitive topics."

- Cargill stressed in its 2015 Corporate Responsibility report that "[w]e obey the law. Obeying the law is the foundation on which our reputation and Guiding Principles are built. We conduct our business with integrity. We compete vigorously but do so fairly and ethically. We ... comply with the laws and regulations that support fair competition and integrity in the marketplace." Cargill reaffirmed this commitment in subsequent Corporate Responsibility reports.

- National Beef's former majority shareholder, Jefferies, acknowledged in its 2014 Annual Report that National Beef was "subject to extensive governments regulations," including by the USDA and "is subject to the Packers and Stockyard Acts of 1921."

216. Regarding Cargill, JBS S.A.'s, and Tyson Foods's conduct involving false/pretextual statements or false/pretextual financial data, Cargill did so for the benefit of CMS, JBS S.A. did so for the benefit of JBS USA, Swift, and Packerland, and Tyson Foods did so for the benefit of Tyson Fresh.

217. In addition to Defendants' affirmatively concealing their conspiracy, Defendants' conspiracy was inherently self-concealing because it depended on secrecy for its successful operation.

218. Defendants also misrepresented the real reasons for their plant closures, slaughter reductions, and withdrawal from the cash cattle trade as follows:

### A.   The Cargill Defendants

219.   As alleged earlier, the Cargill Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance their conspiracy.

220.   To facilitate Defendants' conspiracy, Cargill made public statements offering pretextual explanations to conceal Defendants' unlawful activity.   For example, Cargill used its 2017 Annual Report to explain that "[r]enewed consumer demand for beef [produced] favorable market conditions in North America."

221.   The following year, Cargill proclaimed that its Animal and Nutrition & Protein segment's "strong performance" in 2018 was "fueled by rising domestic and export demand for North American beef" rather than because of Defendants' anticompetitive conduct.

222.   Cargill made these false public statements to conceal its role and participation in the conspiracy alleged in this Complaint.   Instead of disclosing that its "strong performance" stemmed from illegal behavior and tainted profits, Cargill provided pretextual business justifications such as "favorable market conditions" and "rising domestic and export demand."

### B.   The JBS Defendants

223.   As discussed above, the JBS Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

224.   To facilitate the conspiracy, JBS USA made public statements to conceal Defendants' unlawful activity.  For example, in November 2015, JBS USA CEO declared that "[c]attle price will go down" in the United States because "we are going to see more cattle available."

225.   Similarly, on an earnings call in March 2016, JBS S.A.'s founder and CEO stated that JBS would see "better margin[s]" due to an "increase in the herd in the U.S."

226.   JBS executives made similar statements throughout 2016 and 2017 and into 2018, regularly stating that JBS's strong financial performance in the United States was a result of "more cattle available in the U.S.," "cattle price[s being] back to the normal level," and "strong demand for beef."

227.   On earnings calls, JBS offered pretextual business justification for its "improvement in EBITDA margin" and favorable financial projections/results, instead of disclosing that they were the result of Defendants' conspiracy.

C.   **National Beef**

228.   To facilitate the conspiracy, National Beef, through its majority shareholders Jefferies (until 2018 when it sold a majority of its stake) and later Marfrig Global Foods S.A. ("Marfrig"), used public statements to conceal Defendants' unlawful activity.

229.   For example, in October 2015, Jefferies stated that the anticipated expansion of the cow herd "bodes well for [meatpacking industry] margins as it will lead to an increase in the number of fed cattle available for slaughter."

230.   In October 2016, Jefferies explained that the "rebuilding of the domestic US cattle herd ha[d] dramatically affected the market for fed cattle" when justifying how, "[f]rom June 27, 2015 to June 25, 2016, the average market price per pound of fed cattle ha[d] fallen from $1.48 to $1.16."

231.   Jefferies offered similar pretextual justifications throughout 2017 and 2018, such as "National Beef generated record results for [the last 12 months] on the back of a more balanced supply of cattle and robust end market demand," "an increased supply of cattle in 2017 has driven higher margins and greater capacity utilization versus 2016," "pre-tax income grew by $78.3 million, as increased cattle availability and strong demand for beef continued to support strong margins," and "because the peak in supply of fed cattle ready for slaughter lags the peak size of the beef cowherd, throughput should continue to increase for at least the next several years, supporting continued above-average packer margins."

232.   These statements were made during Jefferies' Investor Day presentations in 2015, 2016, and 2017, at which National Beef's CEO and President was scheduled to speak on topics related to National Beef's performance.

233.   Marfrig similarly offered false justifications for high beef prices and low cattle prices caused by the conspiracy after Marfrig acquired a controlling stake in National Beef.

234.   For example, Marfrig reported in November 2018 that, "[i]n the United States, the cattle availability combined with stronger domestic and international demand has been supporting better margins."

235.   In 2018, during a third-quarter company earnings call, Marfrig executives reiterated the preceding paragraph's point by claiming that "the U.S. beef industry has delivered record results" because of "an ample supply of cattle" and "strong demand in both the domestic and international markets."  Although Marfrig declared that it had attained record results and better margins while reducing cattle slaughter volumes, it misrepresented that these results were due to "fewer weeks in the third quarter '18 compared to the third quarter 2017."

236.   National Beef's CEO, President and Director of National Beef (but referred to by Marfrig CEO as "CEO of [Marfrig's] North American operation") – participated in the 2018 earnings call.

237.   Jefferies and Marfrig made these pretextual public statements on behalf of National Beef – which, as alleged above, was the original source of the pretextual public statements – to conceal their role and participation in the conspiracy.  Instead of disclosing that their record results and better margins stemmed from the

conspiracy alleged in this Complaint, Jefferies and Marfrig claimed these results were due to non-conspiratorial reasons.

**D.**   **The Tyson Defendants**

238.   As discussed above, the Tyson Defendants shared a unity of corporate interest and operated as part of a single enterprise to advance the conspiracy.

239.   To facilitate the conspiracy, Tyson Foods made public statements to conceal Defendants' unlawful activity.  For example, Tyson Foods used its SEC filings from 2015 to 2018 to declare that it had "limited or no control" over the pricing and production of cattle because prices were "determined by constantly changing market forces of supply and demand."

240.   As for the factors that influence the cost of cattle, Tyson identified "weather patterns throughout the world, outbreaks of disease, the global level of supply inventories and demand for grains and other feed ingredients, as well as agricultural and energy policies of domestic and foreign governments."

241.   Tyson further stated that it "ceased operations at our Denison, Iowa plant" to "better align our overall production capacity with current cattle supplies." Tyson claimed that "[t]he beef segment earnings improved ... due to more favorable market conditions associated with an increase in cattle supply which resulted in lower fed cattle costs."

242.   Rather than truthfully disclosing that the conspiracy improved its earnings, Tyson Foods issued pretextual business justifications, such as lower fed cattle costs and favorable market conditions.   Tyson Foods made these misrepresentations to conceal its role and participation in the conspiracy.

243.   Defendants made these pretextual statements to mislead Plaintiffs into believing Defendants were acting legally, because, by concealing their conspiracy, Defendants were able to reap supracompetitive profits.

E.   **Plaintiffs' Claims Are Timely**

244.   Plaintiffs' Sherman Act and PSA claims are timely because they had neither actual nor constructive knowledge of Defendants' conspiracy during the time covered by the statute of limitations.  Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged in this Complaint until at least the filing of the cattle ranchers' complaint in the U.S. District Court for the Northern District of Illinois on April 23, 2019.  Defendants engaged in a secret conspiracy that did not reveal facts that would have put Plaintiffs on inquiry notice about the existence of the conspiracy alleged in this Complaint.   Throughout the time relevant to these allegations, Defendants fraudulently concealed their unlawful conduct and conspiracy from Plaintiffs.

245.   Plaintiffs only recently learned about Witness 1 and Witness 2, as early as April 23, 2019, upon the filing of cattle ranchers' complaint.  Witness 1 offers direct evidence that Defendants have been colluding to fix prices.

246.   Plaintiffs did not learn and could not have learned about the USDA and DOJ investigations into price fixing in the beef industry, at any time before March 12, 2020, when Secretary of Agriculture Sonny Perdue announced that the USDA had begun an investigation into suspiciously high beef prices as alleged above.

247.   Before Witness 1's accounts was revealed by the cattle ranchers' complaint and the revelation of the government's investigations, Plaintiffs did not have facts that would have put them on reasonable notice, or inquiry notice, of the existence of Defendants' conspiracy.  Accordingly, a reasonable person under the circumstances would not have been alerted to begin investigating the legitimacy of Defendants' beef prices and conduct before these recent revelations.

248.   Further, throughout the conspiracy, each Plaintiff engaged in due diligence in seeking to ensure that it was receiving competitive pricing for beef.  For example, and without limitation, each Plaintiff used a method of purchasing beef – including, for example and without limitation, seeking price quotes and bids from their suppliers and/or investigating reasonably available public information – that caused it to believe in good faith that at the time that it was receiving competitive prices for beef that it purchased from Defendants and co-conspirators.

249.   Plaintiffs' claims are also timely by virtue of tolling by, among other means, operation of law.

## IX.   <u>DEFENDANTS ENGAGED IN CONTINUING VIOLATIONS</u>

250.   Independent of Defendants' fraudulent concealment, which tolled the statute of limitations on Plaintiffs' claims, Plaintiffs' Sherman Act and PSA claims are timely because the statute of limitations period was restarted each time Defendants committed an overt act.

251.   From the start of their conspiracy, Defendants sold beef to Plaintiffs at prices that were artificially raised above the competitive level, resulting from Defendants' continually renewed and adjusted unlawful agreement.

252.   Defendants' conspiratorial meetings and misrepresentations as alleged above were each among the new and independent overt act in further of the conspiracy that restarted the statute of limitations each time it occurred, because these events advanced the objectives of Defendants' conspiracy and inflicted new and accumulating injury on each Plaintiff.   Indeed, every statement involved different facts and suggestions but sprang from the same seed – Defendants' conspiracy.

253. Defendants' conduct during the conspiracy, including, without limitation, coordinating on the price to pay suppliers for fed cattle and/or slaughter

volumes, were each also new and independent acts in furtherance of the conspiracy that inflicted new and accumulating injury on each Plaintiff.

254.   Each sale of beef by a Defendant to each Plaintiff at a supracompetitive price was also a new and independent overt act in furtherance of the conspiracy and an antitrust and PSA violation that injured Plaintiffs and reset the applicable statutory period.

255.   Defendants' overt acts, or one or more of them in combination, including, but not limited to those alleged above, were new and independent acts that perpetuated their agreement and kept it current with market conditions; they were not merely reaffirmations of Defendants' previous acts.   By constantly renewing and refining their agreement (and overt acts such as those alleged in this Complaint) to reflect market conditions, Defendants inflicted new and accumulating injury on Plaintiffs.

## X.    CLAIMS AND CAUSES OF ACTION

### COUNT I

### VIOLATIONS OF SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1

256.   Plaintiffs incorporate by reference the allegations in paragraphs 1 through 255 above.

257.   Beginning at a time yet to be determined, but no earlier than approximately 2015, and continuing in force and effect, or both, thereafter,

Defendants and their co-conspirators entered and engaged in a continuing agreement, understanding, and conspiracy in unreasonable restraint of trade to fix, raise, increase, and/or stabilize the wholesale price for beef sold to Plaintiffs and others in the United States at artificially elevated levels, in unreasonable restraint of trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

258.   The contract, combination and conspiracy among Defendants and their co-conspirators described in the immediately preceding paragraph consisted of a continuing course, pattern and practice of conduct regarding the pricing and production of fed cattle, and the sale price of beef, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

259.   Defendants' acts in furtherance of their contract, combination or conspiracy in restraint of trade described above were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

260.   The course, pattern and practice of conduct described above included, among other things, a continuing agreement, understanding and concert of action among Defendants and their co-conspirators, the substantial terms and purpose of which were one or more of the following: (a) to fix, stabilize, maintain and/or increase the price of beef sold to Plaintiffs and others in the United States; (b) to allocate the volume of beef sales in the U.S. and/or market shares of beef sales and/or

purchased fed cattle; (c) to control slaughter volumes and/or beef supply in the U.S.; and/or (d) to earn supracompetitive profits on the price of beef sold to Plaintiffs and others in the U.S. that resulted from Defendants' collusion.

261.   In order to formulate and effect the foregoing unlawful combination and conspiracy, Defendants and their co-conspirators engaged in one or more of the overt acts alleged above in this Complaint: (a) they agreed to exchange, and did exchange, current and/or future information concerning cattle slaughter volume, prices to purchase fed cattle, and/or the prices of beef sold to purchasers in the U.S.; (b) they agreed to coordinate, and did coordinate, price levels, price terms, and/or price movements for purchase of fed cattle and/or the sale of beef sold in the U.S.; (c) they agreed on prices, price levels, margin levels, and/or production or slaughter levels of fed cattle and/or beef sold in the U.S.; and/or (d) they agreed to fix, raise, maintain and/or stabilize, and did fix, raise, maintain and/or stabilize, the wholesale price of beef sold to Plaintiffs and others in the U.S.

262.   Defendants and their co-conspirators entered into and refined their unlawful combination or conspiracy through, among other conduct, the overt acts detailed above.

263.   As a result of Defendants and their co-conspirators' conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and during the time relevant to Plaintiffs' claims: (a) Price competition among Defendants and their co-

conspirators in the sale of beef to Plaintiffs and others in the U.S. has been restrained, suppressed and/or eliminated; (b) Prices for beef sold by Defendants, their divisions, subsidiaries, and affiliates, and their co-conspirators, to Plaintiffs and others, have been fixed, raised, stabilized, and/or maintained at artificially high, non-competitive levels throughout the United States; and/or (c) Plaintiffs, who directly purchased beef from Defendants, their divisions, subsidiaries, and affiliates, and co-conspirators, were deprived of the benefits of free and open competition in the purchase of beef.

264.   Defendants' anticompetitive acts described in this Complaint had a direct, substantial, and foreseeable effect on interstate commerce by raising, increasing, maintaining and/or fixing beef prices throughout the United States because Defendants sell their beef in every state.

265.   The conspiratorial acts and combinations alleged above have caused unreasonable restraints in the beef market.

266.   Each Plaintiff has been injured in its businesses or property by reason of Defendants and their co-conspirators' antitrust violations alleged in this Complaint in amounts not yet ascertained.   Each Plaintiff's injury as a direct purchaser of beef is an injury of the type the antitrust laws were designed to prevent and flows from that which makes Defendants and their co-conspirators' conduct unlawful.

267.   The alleged contract, combination, understanding, agreement, or conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF AS TO COUNT I

WHEREFORE, Plaintiffs pray for the following relief:

A.   A jury verdict in the amount of compensatory damages sustained by each Plaintiff;

B.   A judgment for Plaintiffs and against Defendants, jointly and severally, by the Court in treble the amount of the jury verdict, in accordance with Section 4 of the Clayton Act, 15 U.S.C. §§ 15, and for attorneys' fees, costs, and interest as allowable by law; and

C.   Such other and further relief as the Court may deem just and proper.

## COUNT II

## VIOLATION OF THE PACKERS AND STOCKYARD ACT ("PSA")

268.   Plaintiffs incorporate by reference the allegations in paragraphs 1 through 255 above.

269.   The purpose of the PSA is, among other things, to provide for fair trade practices in the sale and marketing of livestock and meat products.  The PSA is remedial legislation and should be construed liberally to give effect its purposes. *E.g.*, *Armour and Co. v. United States*, 402 F.2d 712, 717, 722 (7th Cir. 1968); *Swift & Co. v. United States*, 393 F.2d 247, 253 (7th Cir. 1968).  The PSA provides for a

private right of action for persons injured by a violation of its provisions.  7 U.S.C. § 209.

270.   Each Defendant and co-conspirator is a "packer" as that term is defined in Section 201 of the PSA, 7 U.S.C. § 191, in that each of them are persons engaged in the business of: (a) buying livestock in commerce for purposes of slaughter; (b) manufacturing or preparing meats or meat food products for sale or shipment in commerce; and/or (c) marketing meats, meat food products, or livestock products in an unmanufactured form acting as a wholesale broker, dealer, or distributor in commerce.

271.   Under Section 202 of the PSA, 7 U.S.C. § 192, it is unlawful for any packer with respect to livestock, meats, meat food products, or livestock products in unmanufactured form to:

(a)   Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device;

(b)   Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever;

(c)   Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly;

(d)  Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(e)  Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce;

(f)  Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; and/or

(g)  Conspire, combine, agree, or arrange with any other person to do, or aid and abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d) or (e).

272.  The PSA's enacting regulations contain further restrictions.   For example, the regulations limit packers' rights to share pricing information with competitors.

No packer, dealer, or market agency, in connection with transactions subject to the provisions of the act, shall, in person, or through employed buyers, for the purpose of restricting or limiting competition, manipulating livestock prices, or controlling the movement of livestock, prior to, or during the conduct of, his buying operations: (a) Furnish competitor packers, dealers, market agencies, or their buyers or representatives, similarly engaged in buying livestock, with information concerning his proposed buying operations, such as the species, classes, volume of livestock to be purchased, or prices to be paid; or (b) furnish any other buying information to competitor buyers.

9 C.F.R. § 201.69.

273.    The regulations also require that "each packer and dealer engaged in purchasing livestock, in person or through employed buyers, shall conduct his buying operations in competition with, and independently of, other packers and dealers similarly engaged."  9 C.F.R. § 201.70.

274.    The competitively sensitive information that Defendants and co-conspirators privately sent to or received from one another in support of their conspiracy, including information about their cattle purchases, prices paid for fed cattle, and/or cattle slaughter volumes, was an "article" under the PSA.

275.    Defendants and co-conspirators engaged in other conduct, including without limitation, communicating, arranging, or signaling or otherwise coordinating with each other on cattle purchases and/or beef production in the United States to increase, fix, stabilize, and/or maintain the price of beef sold to Plaintiffs and others in the United States.

276.    The actions of each Defendant and co-conspirator, as set forth above, constitute one or more violations of 7 U.S.C. § 192 and the enacting regulations of the PSA.

277.    Section 308 of the PSA, 7 U.S.C. § 209, provides that if any person subject to the PSA violates any of the provisions of the PSA, then that person shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.  Further, this section provides that such

liability may be enforced by suit in any District Court of the United States of competent jurisdiction.

278.   The violations of 7 U.S.C. § 192 committed by Defendants and their co-conspirators have unlawfully limited the supply of beef and/or manipulated the price of beef, injured Plaintiffs, and caused Plaintiffs damages by forcing them to pay inflated, supracompetitive prices for beef.

### PRAYER FOR RELIEF AS TO COUNT II

WHEREFORE, Plaintiffs demand judgment against each Defendant as follows:

A.   Damages to the maximum extent allowed under law in consequence of the violations of the PSA, and a joint and several judgment in favor of Plaintiffs and against all Defendants.

B.   Attorneys' fees, costs of suit, and interest as allowable by law.

C.   Such other and further relief as the Court may deem just and proper.

## XI.   JURY TRIAL DEMANDED

In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury of all issues so triable.

Dated:  September 15, 2022       Respectfully submitted,


By:  /s/ Emma L. Mediak
     Emma Mediak, Esquire
     GARLINGTON, LOHN & ROBINSON, PLLP
     350 Ryman Street
     Missoula, Montana  59802
     Tel:  (406) 523-2508
     Fax:  (406) 523-2595
     E-mail:  elmediak@garlington.com

***Counsel for Plaintiffs***

Of counsel:

Richard A. Arnold, Esquire
William J. Blechman, Esquire
Kevin J. Murray, Esquire
Douglas H. Patton, Esquire
Samuel J. Randall, Esquire
Michael A. Ponzoli, Esquire
KENNY NACHWALTER P.A.
1441 Brickell Avenue
Suite 1100
Miami, Florida  33131
Tel: (305) 373-1000
Fax: (305) 372-1861
E-mail:  rarnold@knpa.com
       wblechman@knpa.com
       kmurray@knpa.com
       dpatton@knpa.com
       srandall@knpa.com
       mponzoli@knpa.com

650386.1